**BLACK & DECKER (U.S.) INC., and The Black & Decker Corporation, Plaintiffs,**

v.

**PRO–TECH POWER INCORPORATED, P & F Brother Industrial Corporation, Nu–Way Machinery Corporation, Paul Chang, and Freddie Chang, Defendants.**

**BLACK & DECKER (U.S.) INC., The Black & Decker Corporation, and Black & Decker Inc., Plaintiffs,**

v.

**PRO–TECH POWER INCORPORATED, P & F Brother Industrial Corporation, and Nu–Way Machinery Corporation, Defendants.**

**Civil Nos. 98–124–A, 97–1123–A.**

United States District Court, E.D. Virginia, Alexandria Division.

Nov. 16, 1998.

the same rationale which is dispositive of the statutory trademark infringement claim.

Raymond P. Niro, John C. Janka, Raymond P. Niro, Jr., Christopher J. Lee, Sally Wiggins, Niro, Scavone, Haller and Niro, McLean, Virginia, Amy Sanborn Owen, Miles & Stockbridge, McLean, Virginia, for plaintiffs.

Robert B. Breisblatt, Jerold B. Schnayer, Kara E.F. Cenar, Leonard Friedman, Thomas L. Gemmell, Welsh and Katz, Ltd., Chicago, Illinois, Kimberly Newman, Hunton & Williams, Washington, DC, for defendants.

## MEMORANDUM OPINION

CACHERIS, District Judge.

The Plaintiffs, Black & Decker (U.S.) Inc., The Black & Decker Corporation, and Black & Decker Inc. ("Black & Decker"), brought these consolidated actions alleging that the Defendants, Pro–Tech Power Incorporated ("Pro–Tech"), P & F Brother Industrial Corp. ("P & F"), Nu–Way Machinery Corp. ("Nu–Way"), Paul Chang, and Freddie Chang, committed unfair competition and false designation of origin, trade dress infringement, trademark infringement, trademark dilution, design patent infringement, copyright infringement, and false advertising in the market for professional power tools. The Court conducted a bench trial of this matter from August 25 through September 1, 1998, and now makes the following findings of fact and conclusions of law.

## PARTIES

Black & Decker (U.S.) Inc. is a Maryland corporation that designs and manufactures the "DeWalt" line of professional power tools. The Black & Decker Corporation is a Maryland company that owns trademark rights in the DeWalt line. Black & Decker Inc. is a Delaware company that owns or otherwise enjoys standing to sue for the infringement of United States Design Patent No. 346,173 ("the '173 patent").

Pro–Tech Power Incorporated is a California corporation that markets and distributes the "Pro–Tech" line of professional power tools. P & F Brother Industrial Corporation and Nu–Way Machinery Corporation are Taiwanese companies that manufacture some of the products in the Pro–Tech line. Paul and Freddie Chang are individual defendants who allegedly own or control the corporate defendants in this case, but who successfully moved for a Directed Verdict in their favor at trial. (Tr. at 1293 – 97.)

## COUNTS

The Amended Complaints in these consolidated actions allege a variety of causes of action under state and federal law:

Count 1 contends that the Defendants manufacture and distribute Pro–Tech power tools that mimic the appearance of DeWalt power tools in a way that imposes unfair competition and suggests a false designation of origin in violation of the Lanham Act. Count 2 alleges that this conduct infringes on Black & Decker's trade dress under the Lanham Act, and Count 3 alleges that this conduct constitutes common law trademark infringement and creates unfair competition under state law. Count 4 alleges state and federal trademark dilution.

Civil Action No. 97–1123–A contains three additional causes of action. Count 5 contends that Pro–Tech's CS7212 12″ compound mitre saw infringes on a patent that Black & Decker owns. *See* United States Design Patent No. 346,173. Count 6 alleges that the

instruction manual for the Pro–Tech CS7212 infringes on a copyright that Black & Decker owns. *See* United States Copyright Registration No. TX4–508–466. Count 7 alleges that by representing that the Pro–Tech CS7212 had 100% ball bearing construction and a 4,000 RPM motor, the Defendants committed false advertising in violation of the Lanham Act.

The Defendants deny each of these claims and argue that the doctrine of estoppel by laches precludes Black & Decker from pursuing its trademark and trade dress infringement claims. Pro–Tech also makes two counterclaims. Count 1 alleges that Black & Decker initiated this litigation solely to harm Pro–Tech's business and to damage its reputation in a way that constitutes unfair competition under state and federal law. Count 2 alleges that by representing DeWalt power tools as having been "Made in the U.S.A.," Black & Decker violated the false advertising provisions of the Lanham Act.

### JURISDICTION

The Court has subject matter jurisdiction over the federal questions in this case pursuant to 28 U.S.C. § 1331, 28 U.S.C. § 1338, and 15 U.S.C. § 1121(a), with supplemental jurisdiction over the state law claims pursuant to 28 U.S.C. § 1367. Venue is facially proper to the extent that at least one of the defendants sold some allegedly infringing power tools in the Eastern District of Virginia.[1] *See* 28 U.S.C. § 1391(b).

■ Although Pro–Tech concedes that it is subject to the power of this Court, P & F and Nu–Way challenge personal jurisdiction on the grounds that they are Taiwanese manufacturers that never directly offered any products for sale in this state. Black & Decker made a prima facie case for the assertion of personal jurisdiction against

them during pretrial proceedings, and now bears the ultimate burden of establishing by a preponderance of the evidence that both the Virginia Long–Arm Statute and the Due Process Clause of the United States Constitution would permit the exercise of jurisdiction. *See Mylan Labs., Inc. v. Akzo, N.V.,* 2 F.3d 56, 60 (4th Cir.1993) (citing *Omni Capital Int'l v. Rudolf Wolff & Co.,* 484 U.S. 97, 102–03, 108 S.Ct. 404, 98 L.Ed.2d 415 (1987)).

Section 8.01–328.1(A)(4) of the Virginia Code authorizes personal jurisdiction over a defendant who causes tortious injury in this state by an act or omission that took place elsewhere, if the defendant "regularly does or solicits business, or engages in any other persistent course of conduct, or derives substantial revenue from goods used or consumed or services rendered" in Virginia. *See Blue Ridge Bank v. Veribanc, Inc.,* 755 F.2d 371, 373 (4th Cir.1985).

As the Court observed during pretrial proceedings, P & F and Nu–Way regularly solicit business in this state insofar as each of them advertises their products on World Wide Web sites. The sites are accessible to any Virginia resident over the Internet, and they provide interested customers with the companies' e-mail addresses. Black & Decker established the existence of these Web sites prior to trial, and neither P & F nor Nu–Way rebutted their significance either then or thereafter, aside from making unsupported and conclusory allegations that the sites were unauthorized.[2] Absent any meaningful evidence to substantiate those allegations, the Court finds that these Web sites constitute a means of advertising by which P & F and Nu–Way regularly solicit business from Virginia residents within the meaning of the Virginia Long–Arm Statute. *See Telco Communications v. An Apple A Day,* 977 F.Supp. 404, 407 (E.D.Va.1997).

---

1. Sales alone constitute a tenuous basis with which to connect this case to the Eastern District of Virginia. *See Johnson Creative Arts, Inc. v. Wool Masters, Inc.,* 743 F.2d 947, 955–56 (1st Cir.1984), *cited in Eastern Scientific Mktg., Inc. v. Tekna–Seal, Inc.,* 696 F.Supp. 173, 178 (E.D.Va. 1988). The Court will not question venue at this late stage of these proceedings, but will suggest that the parties consider whether they should have filed suit in another judicial district.

2. Nu–Way, for example, argued during a pretrial hearing that a particular Web site could not serve as the basis for personal jurisdiction because none of its employees or agents ever authorized the maintenance of the site or its contents. But the fact that the site still exists one year after that hearing belies this claim, as Nu–Way has made no apparent attempt to have it taken down. *See Welcome to NU–WAY* (visited Nov. 12, 1998) <htt p://www.taiwan–link.com/nuway.html>.

In order for the exercise of personal jurisdiction to satisfy the Due Process Clause, P & F and Nu–Way must have had sufficient minimum contacts with this forum, such that haling them into court would not offend "traditional notions of fair play and substantial justice." *International Shoe Co. v. Washington,* 326 U.S. 310, 316, 66 S.Ct. 154, 90 L.Ed. 95 (1945). Stated differently, P & F and Nu–Way must have "purposefully avail[ed]" themselves of this district, *see Hanson v. Denckla,* 357 U.S. 235, 253, 78 S.Ct. 1228, 2 L.Ed.2d 1283 (1958), and the assertion of personal jurisdiction against them must be fair and reasonable under the circumstances, *see World–Wide Volkswagen Corp. v. Woodson,* 444 U.S. 286, 297, 100 S.Ct. 559, 62 L.Ed.2d 490 (1980).

As the Fourth Circuit has made clear, "[t]he placement of a product into the stream of commerce ... is not an act ... [that is] purposefully directed toward the forum State." *Lesnick v. Hollingsworth & Vose Co.,* 35 F.3d 939, 944 (4th Cir.1994) (quoting *Asahi Metal Indus. Co. v. Superior Court of Calif.,* 480 U.S. 102, 112, 107 S.Ct. 1026, 94 L.Ed.2d 92 (1987) (plurality opinion)). Simple "awareness that the stream of commerce may or will sweep the product into the forum State" is not enough to render the exercise of personal jurisdiction constitutional. *Lesnick,* 35 F.3d at 945 (quoting *Asahi,* 480 U.S. at 112, 107 S.Ct. 1026). Against this background, the mere fact that P & F and Nu–Way manufacture power tools for Pro–Tech with knowledge that some of those tools will be sold in Virginia is insufficient to support the assertion of personal jurisdiction.

Black & Decker's case for jurisdiction therefore depends entirely on the argument that P & F and Nu–Way had such a close relationship with Pro–Tech as to render them subject to jurisdiction because of Pro–Tech's contacts with this state. Although Paul Chang is the President or Chairman of the Board of Directors for each of the three companies (Tr. at 1008 – 09), the weight of the evidence adduced at trial demonstrated that Pro–Tech, P & F, and Nu–Way are independent companies both in form and in fact—with separate management, bank accounts, corporate offices, and the like (Tr. at 837 – 39, 867 – 68, 1010). Under these circumstances, Black & Decker's attempt to base jurisdiction on an alter ego or instrumentality theory must fail.[3]

Moreover, even if the three companies were closely related, the exercise of personal jurisdiction would still offend due process because the connections among them dealt only with the general way in which P & F and Nu–Way—both of which are Taiwanese corporations—could supply power tools to Pro–Tech—which is a California corporation. Absent any evidence that P & F and Nu–Way specifically structured their relationship with Pro–Tech in order to facilitate the sale of power tools in Virginia, or that they otherwise purposefully availed themselves of this state, the Court cannot assert jurisdiction over them. *See Lesnick,* 35 F.3d at 946–47 (concluding that a federal court cannot derive personal jurisdiction over one company by examining the relationship that it had to another, unless the particular elements of the association between the two companies specifically related to the forum state or otherwise rose to the level of purposeful availment).

## FINDINGS OF FACT

In 1990, Black & Decker faced a "very desperate position" in the market for professional power tools. (Tr. at 145.) "[E]nd user demand ... had diminished to a point of major concern," as Black & Decker had a market share of only eight percent compared to competitors with a brand share as high as fifty-three percent. (Tr. at 145, 194; PTX 1338.) The company was "losing any hope of competing" and was considering dropping its line of professional power tools altogether. (Tr. at 145 – 46.)

---

**3.** Even if the Court could assert personal jurisdiction over P & F and Nu–Way, the fact that they are separate and distinct corporate entities would preclude their liability on the merits, because Pro–Tech alone was responsible for selling, marketing, and distributing the power tools at issue in this case. Without sufficient evidence to link Pro–Tech, P & F, and Nu–Way together, reluctance and caution must temper the Court's power to pierce the corporate veil. *See DeWitt Truck Brokers, Inc. v. W. Ray Flemming Fruit Co.,* 540 F.2d 681, 684 (4th Cir.1976).

Joseph Galli, the new Vice–President of Marketing for Black & Decker's U.S. Power Tool Division, concluded that the company needed to change its image in order to revitalize its position in the professional power tool market. (Tr. at 146.) Tradesmen thought of Black & Decker as a brand for homeowners and confused its finest professional tools with its consumer-grade items because they had the same color scheme. (Tr. at 146 – 47.) In contrast, "every [other] professional power tool company that had any significant segment of the market had [its] own distinctive identity"—with Makita known for its teal blue professional power tools, Milwaukee known for its fire engine red colors, Bosch known for its royal blue colors, and Hitachi known for its bright green colors. (Tr. at 147 – 49.)

Against this background, Galli decided to introduce a "new family of products with a new distinctive proprietary identity" that would differentiate the company's professional power tools from its consumer power tools. (Tr. at 149.) The "DeWalt" line would have a "unique distinctive proprietary color and look" that potential purchasers could associate with high quality products specifically designed and targeted for professional users. (Tr. at 153.) A new color scheme would identify this flagship line, consistent with the advice of retailers who had made clear that color was a significant factor in product purchasing decisions. (Tr. at 154.)

Black & Decker formally introduced the DeWalt line at a national sales meeting in late January, 1992. (Tr. at 156.) It began shipping the first wave of DeWalt power tools in the beginning of February. (Tr. at 156.) There were thirty-three different products in the initial launch, and the entire line used yellow as the dominant product color, "accented carefully by . . . black and the selective use of silver on those tools that had exposed metal components." (Tr. at 153 – 56; PTX 700 – 05.) An industrial design team carefully decided how to paint each tool in the line so as "to give it the distinctive DeWalt identity." (Tr. at 156 – 59, 175 – 76, 929; PTX 700 – 05.)

Galli's decision to use a yellow and black color scheme generated considerable contro-versy at Black & Decker. His boss laughed at the tools, calling them "bananas, canaries, [and] lemons." (Tr. at 260.) None of Black & Decker's competitors in the professional power tool market used a yellow and black color scheme, making his choice even more unusual. (Tr. at 261.) But Galli persisted, and at his direction, Black & Decker undertook extensive marketing efforts designed to promote the DeWalt look among professional power tool users. (Tr. at 160 – 63.)

"SWARM teams"—which consisted of company representatives who traveled to different cities in yellow and black vans or trucks—visited construction sites in order to show off DeWalt products to professional tradesmen. (Tr. at 160 – 69; PTX 887, PTX 894, PTX 1342.) A separate sales force went to retail stores in order to familiarize customers with the new tools, while product displays, print advertising, and event sponsorships rounded out the marketing campaign. (Tr. at 168 – 71.) In 1992 alone, Black & Decker invested approximately fifty million dollars to promote DeWalt power tools (Tr. at 171), and by 1998 the line had grown to include 250 similarly-colored products (Tr. at 158 – 59).

These promotional efforts consistently displayed a "yellow theme with the black highlights and the silver highlights," so that customers would associate those colors with the DeWalt line. (Tr. at 172.) As Richard Rapuano, the Senior Product Manager for Black & Decker's Woodworking, Drilling, and Fastening Tools, testified at trial, "all the different things that we were doing were either yellow, black and silver or yellow and black. And everything was emblazoned with the DeWalt logo to try and drive just the whole image." (Tr. at 891.)

Some of the advertisements that Black & Decker used also promoted the DeWalt line as having been "Made in the U.S.A." The 1992 catalog that first introduced the new DeWalt products had "Made in the U.S.A." logos throughout (Tr. at 223 – 24; PTX 700.) Similarly, the trucks that Black & Decker sent out to demonstrate DeWalt tools at construction sites often had "Made in the U.S.A." decals affixed to their sides, as did a Busch Grand National race car that the com-

pany sponsored. (Tr. at 219 – 20.) The purpose of this marketing campaign was to highlight the fact that of the thirty-three products that Black & Decker included in its initial DeWalt launch, thirty were manufactured in the United States. (Tr. at 212 – 13.) Although Black & Decker only produces approximately eighty-seven percent of its DeWalt tools in the United States (Tr. at 211), the remaining thirteen percent have had accurate labels indicating their correct country of origin at all times relevant to this case (Tr. at 283).

Black & Decker took several other substantive steps to ensure that professional power tool users would associate the DeWalt look with quality products. It instituted a 1–800 number that purchasers could call for answers to questions and help with application ideas. (Tr. at 159.) It also provided a year of free maintenance with each product purchased, guaranteed a 48–hour turnaround time on product repairs, and offered loaner tools in the interim—"unheard of service breakthroughs" designed to cultivate a franchise around the DeWalt line. (Tr. at 159 – 60.) Black & Decker's financial support for various vocational training programs further bolstered the DeWalt image in the minds of professional power tool users. (Tr. at 169 – 70.)

As a result of these marketing efforts, the "DeWalt look" quickly took hold in the spring of 1992. (Tr. at 172 – 73, 891 – 93, 1837.) Customers remarked that they "loved the yellow tools" and even identified the products as "DeWalt yellow." (Tr. at 891 – 93.) Newspaper and magazine articles celebrated Black & Decker's success in promoting the DeWalt image, and over twenty marketing awards honored the level of popular recognition that the tools had acquired. (Tr. at 171 – 72, 182 – 83; PTX 712 – 31, PTX 886, PTX 891.) The Harvard Business School created a case study on the DeWalt line, and described the new color scheme as a major factor in its success. (Tr. at 183 – 84.) Whereas Black & Decker's professional power tool sales totaled only $36 million in 1991, they rose to over $120 million in 1992 and are projected to exceed $1.2 billion in 1998—now capturing over 50% of the market. (Tr. at 180 – 81, 194; PTX 1339.)

Sometime after Black & Decker introduced the DeWalt line, Pro–Tech began "considering" its own series of yellow and black power tools. (Tr. at 630; DTX 231.) James Lancaster, Pro–Tech's General Manager, conceded at trial that by the time he asked Pro–Tech's major customers for their "input" on whether to use yellow and black colors, Black & Decker already had launched the first wave of DeWalt power tools. (Tr. at 630; DTX 231.) Although Pro–Tech may have distributed undated photographs of the new colors during the "first part" of 1992 (Tr. at 631 – 33; DTX 1124), it did not actually unveil the new colors until a trade show in August, 1992 and did not make any newly-colored products available for shipment until the end of 1992 or the beginning of 1993—long after consumers had begun attributing those colors to DeWalt. (Tr. at 435 – 36, 635 – 40; PTX 108, PTX 263, PTX 264.)

But having seen Black & Decker's phenomenal success, Pro–Tech closely copied the DeWalt look when designing and expanding its own competing line of yellow and black power tools. Pro–Tech's 12″ compound mitre saw, for example, has substantially the same color scheme as DeWalt's 12″ compound mitre saw. Both products have a yellow kerf plate, motor housing, and handle, with a black motor end cap, dust ejection port, and mitre lockdown knob. (Tr. at 361 – 62, 365 – 66; PTX 1120, PTX 1128.) The lower blade guard is smoke-colored, while the upper blade guard and base are silver. (Tr. at 362 – 64; PTX 1120, PTX 1128.) Similarly, both the Pro–Tech chop saw and the DeWalt chop saw have a black base with yellow upper blade guards, lower blade guards, and end caps. (Tr. at 353 – 54; PTX 1124, PTX 1126.) The motor housing on each tool is silver, and the name plates are yellow against a black background. (Tr. at 353 – 54; PTX 1124, PTX 1126.) In short, despite some nominal differences in the appearance of certain screws and other parts, the overall color scheme of the Pro–Tech line—and the particular placement of yellow on some parts and black on others—is virtually identical to the

overall color scheme of each corresponding tool in the DeWalt line, and in a way that belies the possibility of coincidence.[4]

As Black & Decker exhaustively demonstrated at trial, Pro–Tech tools mimicked DeWalt tools so closely that actual consumer confusion resulted throughout the market for professional power tools. A Woodworkers Warehouse store in Bangor, Maine experienced twelve to sixteen instances of actual consumer confusion between Pro–Tech tools and DeWalt tools. (Tr. at 1251 – 57.) Nora Furr, a purchasing agent for Marco Supply Company in Roanoke, Virginia, confused the yellow and black colors on a Pro–Tech saw for the yellow and black colors that she was accustomed to seeing on the DeWalt line until a Black & Decker representative corrected her mistake. (Tr. at 1853 – 54, 1857 – 59.) Richard Jarrett, a self-employed plasterer, mistakenly bought a Pro–Tech table saw thinking that it was a Black & Decker product, again because of the yellow and black color scheme that he associated with DeWalt. (Tr. at 1864 – 65, 1866 – 68.) John Fagan, a licensed electrician, observed that Pro–Tech tools had the "same coloring" as DeWalt tools and thought that Pro–Tech was simply a "lesser brand" of DeWalt rather than a different company altogether. (Tr. at 1039 – 40, 1041 – 42.)

Consistent with this actual consumer confusion, Black & Decker service centers routinely received broken or defective Pro–Tech products that end users brought in under the mistaken belief that a DeWalt warranty would cover them. (Tr. at 206 – 10; PTX 125.) Gary Cook, for example—a construction manager in New Orleans—thought that a Black & Decker service center could repair his broken Pro–Tech chop saw because he assumed from its yellow and black color scheme that it was related to DeWalt. (Tr. at 444 – 45, 450 – 51.) Despite repeated requests to the contrary, retailers—presumably those best poised to know which companies manufactured which products—also tried to send Black & Decker their unwanted Pro–Tech power tools. (Tr. at 208 – 09.)

Black & Decker unquestionably incurred damages as a result of this consumer confusion because Pro–Tech's products suffered from serious quality problems ranging from cracked housings, missing parts, and defective components to back-ordered shipments and more. (Tr. at 302 – 09, 778 – 81; PTX 47, PTX 55, PTX 290.) Eric Fernandes, who was Pro–Tech's Marketing Manager at the time, repeatedly complained about these problems to the company's original equipment manufacturer, P & F. (Tr. at 778 – 81; PTX 25.) In November of 1996, James Lancaster ordered P & F to stop shipping Pro–Tech's 12″ compound mitre saw altogether after he discovered major problems with the thousands of saws that it already had distributed across the United States. (Tr. at 308 – 09.)

As Joseph Gàlli explained at trial, Pro–Tech's quality problems directly affected Black & Decker to the extent that confused Pro–Tech power tool users sometimes attributed these defects and breakdowns to DeWalt. (Tr. at 210 – 11.) Pro–Tech's infringing power tools also harmed Black & Decker by taking up merchandising space on retail shelves, cutting into sales of its professional power tools, and generally diminishing consumer appreciation for the relative quality of the DeWalt line. (Tr. at 210 – 11.)

Pro–Tech's advertisements allegedly contributed to the harm that Black & Decker suffered whenever a customer became disappointed by a Pro-tech power tool that he mistakenly associated with DeWalt. The packaging for the Pro–Tech CS7212 12″ compound mitre saw claimed that the product had 100% ball-bearing construction and a motor speed of 4,000 RPM when in fact it did not. (Tr. at 310 – 11, 319 – 23.) Eric Fernandes complained about these inaccuracies to P & F. (Tr. at 311 – 13, 320 – 21; PTX 12, PTX 288.) Even so, every CS7212 shipped as of December 17, 1996 falsely described this mitre saw as having 100% ball-bearing construction (Tr. at 777), and Pro–Tech initially refused to change its rated engine speed, despite a test run which re-

---

4. Even Paul Chang, the President of Pro–Tech's Board of Directors, could not distinguish a Pro–Tech saw and a DeWalt saw placed side by side in a photograph, and he admitted during his deposition that the two products had a "very similar" color scheme. (Tr. at 1023.)

vealed that the actual engine speed was lower (Tr. at 321 – 22).

Pro–Tech's attempt to profit from the reputation of the DeWalt line extended well beyond the distinctive yellow and black color scheme. When Black & Decker designed and patented the aesthetic characteristics of the DeWalt DW705 12″ compound mitre saw, it included a number of novel and ornamental features that collectively differed from anything present in prior art. (Tr. at 707 – 08.) William S. Taylor, who headed the design team for the DeWalt DW705, identified at least eight decorative, nonfunctional characteristics that contribute to the overall look that the product conveys. (Tr. at 665 – 68, 680 – 696, 701 – 08; PTX 1128.)

The Pro–Tech CS7212 copied these same characteristics so as to create an overall visual impression that is substantially similar to that of the DW705. (PTX 1120.) Daniel Moon, the Defendants' industrial design expert, attempted to make minute, piece-by-piece distinctions between some of the parts on the two mitre saws (Tr. at 1513) and argued that some of the aesthetic characteristics actually had a functional purpose (Tr. at 1507). But notwithstanding his side-by-side comparison of the two saws (Tr. at 1556 – 57), he did not dispute that when viewed from any of the positions shown in Black & Decker's design patent and considering only the ornamental rather than the functional characteristics of the two products, the Pro–Tech CS7212 conveys an overall visual impression that is so similar to the DeWalt DW705 as to confuse an ordinary observer.

Pro–Tech also appropriated parts of the copyrighted instruction manual that Black & Decker developed to accompany its 12″ compound mitre saw. Two of the illustrations in the Pro–Tech manual are virtually identical to the corresponding illustrations in the DeWalt manual. (PTX 15, PTX 16, PTX 287.) That Pro–Tech could have created identical illustrations by chance is belied by the January 9, 1996 memorandum that Eric Fernandes sent to P & F's General Manager, Jerming Shei, in which Fernandes noted that his "corrections for page 18 of the CS7212 [manual] include[d] two pictures that [he]

took from the DeWalt DW705 Instruction Manual." (PTX 16A.) In short, the evidence suggests that when creating the instructional manual for the CS7212, Pro–Tech copied portions of the copyrighted instructional manual for the DW705.

## CREDIBILITY DETERMINATIONS

The Court must judge the credibility of the witnesses in order to determine what weight, if any, to assign to their testimony. Except as to damages, which will be discussed later in this Opinion, the Court concludes that Joseph Galli, Richard Rapuano, and the other witnesses whom the Plaintiffs called to testify are more credible than James Lancaster, Jerming Shei, and the other witnesses whose testimony the Defendants offered at trial.

The Court makes these credibility determinations with respect to four significant testimonial conflicts. First, whereas the Plaintiffs argued that their yellow and black power tools acquired secondary meaning in the minds of consumers well before Pro–Tech introduced its own yellow and black power tools, the Defendants claimed that they actually entered the market first. James Lancaster, for example, tried to testify that Pro–Tech started offering yellow and black products during the "first part" of 1992—perhaps even before Black & Decker had unveiled the DeWalt line at all. (Tr. at 633.)

But none of the documents that Pro–Tech offered to support this proposition conclusively established that it actually entered the market that early, and Lancaster himself admitted that the company did not make its newly-colored products available for shipment until the end of 1992 or the beginning of 1993. (Tr. at 635 – 40; PTX 108, PTX 263, PTX 264.) According to the testimony of Joseph Galli, Richard Rapuano, and a host of actual consumers—all of whom the Court finds credible—the yellow and black color scheme on the DeWalt line already had achieved secondary meaning by that time. (Tr. at 172 – 73, 891 – 93, 1837.) To the extent that Pro–Tech's evasive witnesses tried to suggest otherwise during their testi-

mony, the Court concludes that their credibility is suspect.

Second, whereas the Plaintiffs argued that Pro–Tech intentionally copied the yellow and black color scheme on the DeWalt line as well as the patented design of the DW705, the Defendants claimed that any similarities were purely accidental. James Lancaster, for example, maintained that he did not recall having seen the DeWalt colors before he selected the new Pro–Tech colors (Tr. at 325), and Jerming Shei testified that he could not remember whether Pro–Tech's CS7212 looked "too similar" to DeWalt's DW705 (Tr. at 1404 – 05).

Even so, Lancaster could not deny at trial that the aesthetic similarities between Pro–Tech's chop saws and DeWalt's chop saws were more than just a coincidence. (Tr. at 358 – 59, 369 – 70.) He also admitted that he "might have" looked at the DeWalt DW705 mitre saw before selecting the same colors for the Pro–Tech CS7212 mitre saw, and that he "might have" sent a sample DeWalt saw to P & F before it started making a similar product for Pro–Tech. (Tr. at 368.) Tellingly, Shei testified that Lancaster insisted that certain parts on the Pro–Tech CS7212 use silver paint—just like the same parts on the DeWalt DW705—although it was functionally unnecessary and more expensive than other alternatives. (Tr. at 1408 – 09.) Pro–Tech even provided P & F with copies of various DeWalt advertisements depicting the yellow and black colors that Black & Decker had chosen. (Tr. at 328 – 29.)

Lancaster also asked retailers to display Pro–Tech mitre saws near DeWalt mitre saws (Tr. at 376 – 77)—presumably so that consumers might assume some relationship between the two companies. Eric Fernandes went so far as to use an assumed name and ask Black & Decker for updated information about the DeWalt line. (Tr. at 769 – 71.) This overwhelming evidence leads the Court to conclude that Pro–Tech intentionally and directly copied the yellow and black color scheme of the DeWalt line, as well as the ornamental design features of the DW705.[5] To the extent that Lancaster, Shei, and the Defendants' other witnesses attempted to deny any copying, the Court finds that their testimony lacks credibility and does not deserve weight.

Third, whereas William Taylor argued that the Pro–Tech CS7212 conveyed an overall visual impression that was so similar to the DeWalt DW705 as to confuse the ordinary consumer (Tr. at 704 – 08), Daniel Moon attempted to argue that the two products had significant differences (Tr. at 1513), and that any similarities related to functional rather than ornamental features (Tr. at 1507). As discussed later in this Opinion, Moon's methodology—which did not consider the overall visual impression created by each product and instead made only a side-by-side comparison of whether any differences existed—is analytically insufficient to defeat the Plaintiffs' claim for design patent infringement.

To the extent that Mr. Moon's testimony is otherwise relevant, the Court finds that his limited background as an industrial designer who specializes in fitness products (Tr. at 1463), rather than power tools (Tr. at 1525) leaves him unqualified to provide credible testimony on the issues in this case. The Court instead credits the testimony of William S. Taylor, whose experience as a power tool designer provided him with an ample basis with which to evaluate the design of the two products at issue, and who testified that the overall visual impression conveyed by the Pro–Tech CS7212 was so similar to the DeWalt DW705 as to confuse the ordinary consumer. (Tr. at 665 – 68, 704 – 08.)

Fourth, and as explained later in this Opinion, Philip Johnson, the Plaintiffs' survey expert, testified that the yellow and black color scheme on the DeWalt line clearly had secondary meaning (Tr. at 547 – 51, 573 – 74; PTX 345 at 7 – 8), whereas Robert Lavidge, the Defendants survey expert, attempted to point out that these surveys suffered from methodological problems (Tr. at 1182). The

---

**5.** Shei claimed to have had extensive involvement with the design and development of the Pro–Tech CS7212 (Tr. at 1315), even though he was trained as an accountant rather than as an engineer (Tr. at 1299 – 1300)—an inconsistency that further supports the conclusion that the Defendants simply copied the design of the DeWalt DW705.

Court agrees with Lavidge's criticism that Johnson could not measure consumer perceptions any earlier than 1998. (Tr. at 1182.) But as Mr. Lavidge acknowledged at trial, brand identity takes time to develop and cannot arise instantaneously (Tr. at 1203)— meaning that Mr. Johnson's conclusions at least implicitly support the testimony of Joseph Galli and Richard Rapuano, who credibly explained that consumers began to associate yellow and black with the DeWalt line almost immediately after its introduction in late January, 1992 (Tr. at 172 – 73, 891 – 93, 1837).

Johnson also opined that Pro–Tech's similarly-colored products caused actual confusion among professional power tool users (Tr. at 557; PTX 333, PTX 339, PTX 342, PTX 345, PTX 349), to which Lavidge responded with another series of methodological criticisms (Tr. at 1176 – 77, 1182 – 83, 1184 – 86). The Court credits Johnson's testimony because at no time did Lavidge's findings dispute the basic conclusion that Pro–Tech power tools pose a likelihood of confusion with DeWalt power tools. Moreover, even if Johnson's work were suspect, the Court finds that the professional power tool users who attested to their own misunderstandings about Pro–Tech and DeWalt offer credible support for the conclusion that a likelihood of confusion exists. (Tr. at 1041 – 42, 1251 – 57, 1857 – 59, 1866 – 68.)

**6.** Although Black & Decker made some reference at trial to how its trade dress consisted of the overall look of the DeWalt line, the evidence dealt primarily, if not exclusively, with the yellow and black color scheme on these products. As a result, the Court can only evaluate whether the yellow and black color combination on these power tools, as opposed to their general appearance, creates an enforceable trade dress. Similarly, despite evidence that DeWalt power tools sometimes used silver trim, Black & Decker's focus on yellow and black alone effectively limits the Court to these two colors in evaluating whether trade dress infringement may have occurred.

**7.** "(1) Any person who, on or in connection with any goods or services, or any container for goods, uses in commerce any word, term, name, symbol, or device, or any combination thereof, or any false designation of origin, false or misleading description of fact, or false or misleading representation of fact, which—

(A) is likely to cause confusion, or to cause mistake, or to deceive as to the affiliation,

## CONCLUSIONS OF LAW

### I. Lanham Act Claims for Unfair Competition, False Designation of Origin, and Trade Dress Infringement

Black & Decker alleges that Pro–Tech power tools mimic the color scheme of DeWalt power tools in a way that creates unfair competition, suggests a false designation of origin, and constitutes trade dress infringement.[6] Section 43(a) of the Lanham Act[7] governs all of these claims, and requires proof (1) that the plaintiff's product possesses a primarily nonfunctional trade dress; (2) that this trade dress is inherently distinctive or possesses secondary meaning; and (3) that the defendant's allegedly infringing product creates a likelihood of confusion in the marketplace. *See Sunbeam Corp. v. Equity Industries Corp.*, 635 F.Supp. 625, 629 (E.D.Va.1986) (applying these elements to an unfair competition claim), *aff'd per curia*, 811 F.2d 1505 (4th Cir.1987); *Oakley, Inc. v. International Tropic–Cal, Inc.*, 923 F.2d 167, 169 & n. 1 (Fed.Cir.1991) (reciting the same elements for a false designation of origin claim); *Tools USA and Equip. Co. v. Champ Frame Straightening Equip., Inc.*, 87 F.3d 654, 657 (4th Cir.1996) (listing the same elements for a trade dress infringement claim).[8] The Court will consider each element in turn.

connection, or association of such person with another person, or as to the origin, sponsorship, or approval of his or her goods, services, or commercial activities by another person, or

(B) in commercial advertising or promotion, misrepresents the nature, characteristics, qualities, or geographic origin of his or her or another person's goods, services, or commercial activities,

shall be liable in a civil action by any person who believes that he or she is or is likely to be damaged by such act." 15 U.S.C. § 1125(a).

**8.** Black & Decker contends that a false designation of origin claim does not require proof of secondary meaning. (Black & Decker's Post-Trial Reply Brief at 19.) Although the Western District of North Carolina appears to agree, *see Vanwyk Textile Systems, B.V. v. Zimmer Machinery America, Inc.*, 994 F.Supp. 350, 378 (W.D.N.C.1997), there is no controlling authority on point, and the Federal Circuit takes a different view, *see Cicena Ltd. v. Columbia Telecomm'ns Group*, 900 F.2d 1546, 1549 (Fed.Cir.

## A. Functionality

■ In order to recover under the Lanham Act, a plaintiff must prove that its trade dress is primarily nonfunctional. A feature is functional—and therefore outside the scope of trade dress protection—"if exclusive use of the feature would put competitors at a significant nonreputation-related disadvantage." *Qualitex Co. v. Jacobson Prods. Co.,* 514 U.S. 159, 165, 115 S.Ct. 1300, 131 L.Ed.2d 248 (1995) (quoting *Inwood Labs., Inc. v. Ives Labs., Inc.,* 456 U.S. 844, 850 n. 10, 102 S.Ct. 2182, 72 L.Ed.2d 606 (1982)). Stated differently, "a product feature is functional if it is essential to the use or purpose of the article or it affects the cost or quality of the article." *See Inwood Labs.,* 456 U.S. at 850 n. 10, 102 S.Ct. 2182.

■ Black & Decker's yellow and black trade dress clearly satisfies the nonfunctionality requirement. Black & Decker created the DeWalt line at a time when "every professional power tool company that had any significant segment of the market had [its] own distinctive identity." (Tr. at 147 – 49.) Makita, for example, colored its professional power tools in teal blue, while Milwaukee used fire engine red and Hitachi used bright green. (Tr. at 147 – 49.) Black & Decker selected a yellow and black color scheme in order to create this same type of reputational identity. (Tr. at 149 – 54.)

Had Black & Decker painted its power tools in yellow alone, its claim to trade dress protection might be more tenuous. Yellow is, after all, a highly visible safety color. (Tr. at 806.) But the primary purpose and effect of using a color scheme that combined yellow and black together was not to emphasize safety, but instead to give DeWalt a unique look in the minds of professional power tool users. (Tr. at 261.) Against this background, Black & Decker's choice of a yellow and black trade dress was primarily nonfunctional, even if yellow alone might not have been. *See Tools USA,* 87 F.3d at 659 (emphasizing that functional elements that are separately unprotectable can be combined so as to constitute part of an enforceable trade dress); *see also Two Pesos, Inc. v. Taco Cabana, Inc.,* 505 U.S. 763, 764 n. 1, 112 S.Ct. 2753, 120 L.Ed.2d 615 (1992) (observing that the trade dress of a product can include its color or color combinations). *Cf. Qualitex Co.,* 514 U.S. at 164–66, 115 S.Ct. 1300 (holding that the functionality doctrine does not bar the use of color as a trademark).

## B. Secondary Meaning

■ Monetary relief under the Lanham Act is available only when a plaintiff can show that its trade dress already had "secondary meaning" in the minds of consumers by the time the defendant entered the market. *See Perini Corp. v. Perini Constr., Inc.,* 915 F.2d 121, 125–26 (4th Cir.1990).[9,10] This inquiry turns on whether "the consuming public associates [a] product with a certain producer, and, most importantly, is likely to make that same association when the trade dress is used on another producer's product." *M. Kramer Mfg. Co. v. Andrews,* 783 F.2d 421, 449 (4th Cir.1986). Stated simply, a product's overall appearance is said to have secondary meaning when the purchasing public associates its appearance with a single producer or source. *See Inwood Labs.,* 456 U.S. at 851 n. 11, 102 S.Ct. 2182.

■ In determining whether secondary meaning exists, courts will consider a variety of factors including (1) the length and exclusivity of the trade dress; (2) the amount of

---

1990) ("If the plaintiff cannot show that his trade dress has acquired secondary meaning . . . then use of that trade dress by a competitor will not designate any origin and there is no violation of § 43(a)."). But the Court need not reach this issue at all, having concluded that Black & Decker adduced sufficient evidence at trial to show that the DeWalt line already had secondary meaning by the time Pro–Tech made its competing yellow and black power tools available in the marketplace.

**9.** Even without evidence of secondary meaning, a plaintiff can still recover if its trade dress is "inherently distinctive," but Black & Decker did not make this argument at trial. *See Two Pesos,* 505 U.S. at 769, 112 S.Ct. 2753.

**10.** Although injunctive relief only requires proof that secondary meaning exists at the time of suit, Black & Decker here seeks money damages as well—thereby necessitating a determination of when secondary meaning arose. *Cf. McDonald's Corp. v. Druck & Gerner,* 814 F.Supp. 1127, 1132–33 (N.D.N.Y.1993).

advertising expenditures promoting the product; (3) the degree of unsolicited media coverage for the product; (4) sales volume and success; and (5) the extent to which the product's appearance has achieved identity in the minds of the purchasing public. *See Perini*, 915 F.2d at 125–26; *Tools USA*, 87 F.3d at 660 (citing *Pizzeria Uno Corp. v. Temple*, 747 F.2d 1522, 1528 n. 3 (4th Cir. 1984)). Even circumstantial evidence is admissible to establish secondary meaning. *See Tone Bros., Inc. v. Sysco Corp.*, 28 F.3d 1192, 1201 (Fed.Cir.1994).

█ Black & Decker conclusively demonstrated at trial that its considerable marketing efforts caused the distinctive yellow and black color scheme on the DeWalt line to achieve consumer recognition soon after its initial launch in the beginning of February, 1992. Professional power tool users began to associate yellow and black with DeWalt by March of 1992 (Tr. at 172 – 73, 891 – 93, 1837), and Black & Decker's aggressive marketing efforts certainly caused secondary meaning to arise by May of 1992—after DeWalt demonstrations had occurred at construction sites and retail stores across the country (Tr. at 888 – 92), media coverage and marketing awards had generated widespread publicity about the DeWalt look (Tr. at 908 – 910; PTX 712 – 31, PTX 886, PTX 891), customer after customer had commented on the dramatic new colors in the DeWalt line (Tr. at 891 – 93), and Black & Decker already had sold $24 to $25 million in DeWalt tools (Tr. at 895, 900 – 01).

That the DeWalt colors currently enjoy secondary meaning is also beyond debate. Philip Johnson, Black & Decker's survey expert, found that eighty-five percent of the professional power tool users that he polled identified yellow and black with Black & Decker or DeWalt (Tr. at 547 – 51, 573 – 74; PTX 345 at 7 – 8)—a level of consumer recognition that parallels the extent to which the public associates golden arches with the McDonald's Corporation (Tr. at 575, 1202 – 03).

Although Robert Lavidge, the Defendants' survey expert, pointed out that Johnson could only measure consumer perceptions in 1998 (Tr. at 1182), the fact that brand identi-ty takes time to develop (Tr. at 1203), means that Johnson's conclusions inferentially support the testimony of Joseph Galli and Richard Rapuano—whose firsthand experiences at Black & Decker amply demonstrate how quickly consumers began to associate yellow and black with the DeWalt line (Tr. at 172 – 73, 891 – 93, 1837). *See Tone Bros.*, 28 F.3d at 1201–05 (considering a secondary meaning survey conducted in 1990 although the allegedly infringing party entered the market in 1988).

In light of this evidence, the Court finds that the yellow and black color scheme on the DeWalt line achieved secondary meaning in the minds of professional power tools users by May, 1992—more than three months before Pro–Tech introduced its own line of yellow and black power tools at a trade show in August, 1992, and approximately seven months before Pro–Tech actually made its newly-colored products available for shipment toward the end of 1992 or the beginning of 1993. (Tr. at 635 – 40; PTX 108, PTX 263, PTX 264.)

█ Moreover, even if the Court were to ignore this evidence of secondary meaning, the fact that Pro–Tech intentionally and directly copied the yellow and black color scheme on the DeWalt line creates a presumption of secondary meaning that independently enables Black & Decker to proceed with its Lanham Act claims. *See Kramer Mfg.*, 783 F.2d at 448. Pro–Tech's General Manager, James Lancaster, could not deny that the aesthetic similarities between the Pro–Tech chop saw and DeWalt chop saw were more than coincidental. (Tr. at 358 – 59, 369 – 70.) He also admitted that he "might have" looked at a DeWalt mitre saw before selecting the same colors for a competing Pro–Tech mitre saw (Tr. at 368)—a fact that P & F's General Manager, Jerming Shei, corroborated during his deposition (Tr. at 1408 – 09). Pro–Tech even provided P & F with copies of various DeWalt advertisements showing the yellow and black color scheme. (Tr. at 328 – 29.)

Pro–Tech's General Manager also attempted to force retailers to place Pro–Tech products near DeWalt products (Tr. at 376 – 77),

and its Marketing Manager used an assumed name to get updated information about the DeWalt line from Black & Decker (Tr. at 769 – 71). This pattern of conduct establishes intentional and direct copying that leads this Court to presume secondary meaning absent any effective rebuttal at trial. *See Osem Food Industries Ltd. v. Sherwood Foods, Inc.,* 917 F.2d 161, 163 (4th Cir.1990) (describing this presumption as one upon which judgment must issue in the absence of rebutting proof).

## C. Likelihood of Confusion

■ The Lanham Act further requires a plaintiff to show that the defendant's allegedly infringing product creates a "likelihood of confusion" among consumers in the marketplace. This inquiry asks whether the purchasing public is likely to mistake the source of particular goods, or to assume some association, relationship, or sponsorship between the parties or their goods when no such association actually exists. *See Lone Star Steakhouse & Saloon, Inc. v. Alpha of Virginia, Inc.,* 43 F.3d 922, 933 (4th Cir.1995).

■ In determining whether competing products pose a likelihood of confusion, courts will consider a variety of factors including (1) the strength or distinctiveness of the plaintiff's trade dress or trademark; (2) the similarity of the two parties' marks; (3) the similarity of the goods and services that the marks identify; (4) the similarity of the facilities that the two parties use in their businesses; (5) the similarity of advertising used by the two parties; (6) the defendant's intent; and (7) actual confusion. *See Pizzeria Uno,* 747 F.2d at 1527.

■ Black & Decker presented abundant evidence at trial in order to establish that a likelihood of confusion exists between Pro–Tech power tools and DeWalt power tools. As Joseph Galli explained during his testimony, the new colors on the DeWalt line were so strong and distinctive that his boss initially ridiculed them as "bananas, canaries, [and] lemons."—colors that none of the company's competitors had used to date. (Tr. at 260 – 61.) The Pro–Tech line used a virtually identical trade dress, as demonstrated by the tools themselves (Tr. at 353 – 54, 361 – 66;

PTX 1120, PTX 1124, PTX 1126, PTX 1128), and by the testimony of Paul Chang, who admitted that two of the saws, for example, had a "very similar" color scheme (Tr. at 1023). Because Black & Decker and Pro–Tech are direct competitors that sell the same products in the same market, the likelihood of confusion is clear.

But in any event, actual consumer confusion is "patently the best evidence [of a] likelihood of confusion," and Black & Decker adduced this kind of proof as well. *Tools USA,* 87 F.3d at 660 (quoting *Allied Marketing Group, Inc. v. CDL Marketing, Inc.,* 878 F.2d 806, 813 (5th Cir.1989)). For example, twelve to sixteen instances of actual consumer confusion occurred between the two product lines at a Woodworkers Warehouse store in Bangor, Maine. (Tr. at 1251 – 57.) Professional power tool users from across the country mistook the yellow and black colors on Pro–Tech products for the yellow and black colors that they were accustomed to seeing on DeWalt products. (Tr. at 1041 – 42, 1251 – 57, 1857 – 59, 1866 – 68.) Black & Decker service centers also received broken or defective Pro–Tech products that end users and retailers sent in under the erroneous assumption that a DeWalt warranty would cover them. (Tr. at 206 – 10; PTX 125.)

Black & Decker's survey evidence complemented these anecdotal accounts so as to suggest a strong likelihood that consumer confusion will persist if left unredressed. (PTX 333, PTX 339, PTX 342, PTX 345, PTX 349.) In Philip Johnson's surveys of 1200 professional power tool users, three out of five respondents in one poll mistakenly identified a photograph of a Pro–Tech power tool as having some association with DeWalt or Black & Decker. (Tr. at 557.) Sixty-eight percent made this type of identification error when shown a rear view of a Pro–Tech product, and forty-five percent made the same error when shown a front view that prominently displayed a Pro–Tech label. (Tr. at 557.) Although Robert Lavidge challenged certain aspects of these studies in his capacity as the Defendants' survey expert (Tr. at 1176 – 77, 1182 – 83, 1184 – 86), at no time did he dispute Mr. Johnson's basic conclusion

that Pro–Tech power tools posed a likelihood of confusion with DeWalt power tools.

Considering all of this evidence, the Court concludes that Pro–Tech's yellow and black power tools pose a likelihood of confusion with DeWalt's yellow and black power tools. Even if the evidence were insufficient to support this finding, the fact that Pro–Tech intentionally and directly copied the DeWalt look when designing its own competing line of products also creates a binding presumption of consumer confusion absent any effective rebuttal at trial. *See Osem Food Industries*, 917 F.2d at 165.

In short, having established nonfunctionality, secondary meaning, and a likelihood of confusion by a preponderance of the evidence, Black & Decker is entitled to receive protection for the yellow and black color scheme on its DeWalt line of power tools, and accordingly, to recover on Counts 1 and 2 of the Amended Complaints in these cases, consistent with Section 43(a) of the Lanham Act.

### D. Laches Defense

Pro–Tech contends that Black & Decker's trademark/trade dress infringement claims are barred by laches.[11] "In a trademark infringement case, courts may apply the doctrine of estoppel by laches to deny relief to a plaintiff who, though having knowledge of an infringement, has, to the detriment of the defendant, unreasonably delayed in seeking redress." *Sara Lee Corp. v. Kayser–Roth Corp.*, 81 F.3d 455, 461 (4th Cir. 1996).

#### 1. Injunctive Relief

The doctrine of laches is sparingly applied in cases in which the plaintiff seeks equitable relief. Specifically, "estoppel by laches may not be invoked to deny injunctive relief if it is apparent that the infringing use is likely to cause confusion." *Sara Lee*, 81 F.3d at 461. Stated another way, strong proof of a likelihood of confusion trumps the defense of laches. *See Resorts of Pinehurst,*

*Inc. v. Pinehurst National Corp.*, 148 F.3d 417, 423 (4th Cir.1998).

As explained earlier, there is strong proof that Pro–Tech's use of Black & Decker's yellow and black color scheme is likely to cause confusion among consumers. In fact, the Court has found several instances of actual confusion between the DeWalt line and the Pro–Tech line of professional power tools. (Tr. at 1251 – 57, 1853 – 54, 1857 – 59, 1864 – 68, 1309 – 42.) Against this background, Pro–Tech's laches defense to injunctive relief must be denied.

#### 2. Damages

The availability of a laches defense against claims for damages in trademark infringement actions depends upon the facts and circumstances of each case. Nonetheless, the following factors should be considered: (1) whether the trademark owner knew of the infringing use; (2) whether the owner's delay in challenging the infringement was unreasonable or inexcusable; and (3) whether the infringing user was unduly prejudiced by the delay. *See Sara Lee*, 81 F.3d at 461 n. 7; *Brittingham · v. Jenkins*, 914 F.2d 447, 456 (4th Cir.1990).

The first question is at what time, before filing suit, Black & Decker had actual or constructive notice of Pro–Tech's infringement. Pro–Tech contends that Black & Decker had notice as early as October, 1993, because it obtained a copy of Pro–Tech's House of Tools catalogue showing Pro–Tech's line of yellow and black bench top tools.

Pro–Tech points to Joseph Galli's testimony in support of this contention. (Tr. at 279 – 81.) Galli's testimony, however, does not show that Black & Decker had notice that Pro–Tech was engaged in trademark infringement. Galli stated that he was not aware that Black & Decker had received Pro–Tech's catalog. Moreover, even if Black & Decker had received a Pro–Tech catalog, the Court is not convinced that a single catalog alone would have put Black & Decker on notice. In short, there is no meaningful evidence to show that Black & Decker was

---

**11.** The "Defendant's Findings of Fact and Conclusions of Law" make clear that the laches defense pertains only to Black & Decker's trademark/trade dress infringement claims.

aware of any consumer confusion between DeWalt products and Pro–Tech products.

Pro–Tech also maintains that Black & Decker obtained a Pro–Tech 7208 miter saw in February, 1994 and another Pro–Tech miter saw in 1995, which should have put Black & Decker on notice of any infringement. (Tr. at 279, 1366 – 67.) The Court finds that the receipt of only one, or possibly two, of Pro–Tech's saws out of an entire line of tools is not sufficient to have put Black & Decker on notice that Pro–Tech was engaging in trademark infringement.

Pro–Tech next contends that Black & Decker was on notice in November of 1994 or in the summer of 1995 when Galli and other Black & Decker employees visited the P & F facility in Taiwan. (Tr. at 195 – 98, 1358, 1365.) Shei testified that when Galli and other Black & Decker representatives visited the facility, he showed them a conference room in which five of Pro–Tech's products, with yellow, black, and silver color schemes, were on display. (Tr. at 1361.) But Galli testified that he saw many tools and colors at the P & F facility, that he knew that P & F marketed products around the world, not just in the United States, and that he did not remember one color scheme over another. (Tr. at 195 – 98.) The Court finds Galli's testimony credible, and concludes that he did not notice any specific color scheme at the facility, including Pro–Tech's yellow and black tools.

Pro–Tech also argues that Black & Decker said nothing to Shei regarding Pro–Tech's yellow and black color scheme. But this omission is consistent with the fact that Black & Decker was not on notice of Pro–Tech's infringement. Because Black & Decker was unaware of the infringement, it is understandable that no employees commented on it.

Even if the Court were to find otherwise, the earliest possible date that Black & Decker could have been on notice is November, 1994, when Black & Decker representatives first visited the P & F facility. Assuming that Black & Decker was on notice by that time, it still filed suit in July, 1997, imposing a delay of less than three years. *See A.C. Aukerman Co. v. R.L. Chaides Construction*

*Co.*, 960 F.2d 1020, 1032 (Fed.Cir.1992) (en banc) ("The period of delay is measured from the time the plaintiff knew or reasonably should have known of the defendant's alleged infringing activities to the date of suit.").

■ Although "[t]he length of time which may be deemed unreasonable has no fixed boundaries but rather depends on the circumstances," *id.*, it is usually only a "delay of more than six years [that] raises a presumption that it is unreasonable, inexcusable, and prejudicial," *Wanlass v. General Electric Co.*, 148 F.3d 1334, 1337 (Fed.Cir.1998). Because the owner of a trademark who rushes into litigation over trademark infringement may have little evidence of actual confusion and real commercial damage, it "has no obligation to sue until the likelihood of confusion looms large." *Sara Lee*, 81 F.3d at 462 (internal citation omitted).

Black & Decker at most delayed for approximately two-and-a-half years. In light of the need to avoid frivolous lawsuits, and the time it takes to investigate relevant facts, the Court finds that Black & Decker's delay was not unreasonable. *Cf. Skippy Inc. v. CPC Int'l, Inc.*, 674 F.2d 209, 212 (4th Cir.1982) (concluding that the district court properly found that laches barred a trademark suit after a thirty year delay).

■ Further, there is little to no evidence that Black & Decker's delay caused Pro–Tech any material prejudice. Prejudice may be evidentiary or economic:

Evidentiary, or "defense prejudice," may arise by reason of a defendant's inability to present a full and fair defense on the merits due to the loss of records, death of a witness, or the unreliability of memories of long past events, thereby undermining the court's ability to judge the facts.

Economic prejudice may arise where a defendant and possibly others will suffer the loss of monetary investments or incur damages which likely would have been prevented by earlier suit. Such damages or monetary losses are not merely those attributable to a finding of liability for infringement. The courts must look for a change in the economic position of the

alleged infringer during the period of delay.

*Aukerman*, 960 F.2d at 1033 (internal citations omitted); *see also Wanlass*, 148 F.3d at 1337.

In this case, Pro–Tech has not claimed that records have been lost, that witnesses have died, or that memories of long past events have become unreliable. Moreover, James Lancaster could not identify any actions that Pro–Tech would have done differently had Black & Decker filed suit any earlier. (Tr. at 646 – 47.) Accordingly, the Court finds that Pro–Tech was not prejudiced in either an evidentiary or economic manner.

 ▮ A plaintiff:

may also defeat a laches defense if the infringer has engaged in particularly egregious conduct which would change the equities significantly in plaintiff's favor. Conscious copying may be such a factor weighing against the defendant, whereas ignorance or a good faith belief in the merits of the defense may tilt matters in its favor.

*Aukerman*, 960 F.2d at 1033 (internal citations omitted). As previously discussed, there is evidence that Pro–Tech consciously copied Black & Decker's color scheme; it did not just inadvertently use the same color scheme as Black & Decker. Because the equities tilt in Black & Decker's favor, the laches defense must denied.

### E. Damages

▮ 15 U.S.C. § 1117(a) provides that a plaintiff is entitled, subject to the principles of equity, to recover "(1) defendant's profits, (2) any damages sustained by the plaintiff, and (3) the costs of the action." "The trial court's primary function is to make violations of the Lanham Act unprofitable to the infringing party." *Roulo v. Russ Berrie & Co.*, 886 F.2d 931, 941 (7th Cir.1989). An award to the plaintiff of the defendant's profits, even if plaintiff's actual sustained losses may have been less, is appropriate under theories of unjust enrichment or deterrence. *See id.*[12]

moreover, "[w]here the infringement is deliberate and willful, even if the products are non-competitive, both the trademark owner and the buying public are slighted, if the court provides no greater remedy than an injunction." *United States Olympic Comm. v. Union Sport Apparel*, 220 U.S.P.Q. 526, 530 (E.D.Va.1983).

 ▮ Black & Decker introduced evidence of Pro–Tech's profits through the testimony and reports of Jonathan I. Arnold. Arnold has a Masters in Business Administration and is a professional economist specializing in the economic analysis of patents and other intellectual property. (Tr. at 1055 – 56; PTX 373.)

Arnold calculated Black & Decker's trademark/trade dress infringement damages to be $7,215,874, with an additional $1,464,148 in prejudgment interest. (PTX 375: Table 2.) This calculation was based on Pro–Tech's unjust enrichment and also on the profits that Pro–Tech earned in connection with the sale of its yellow and black products. (Tr. at 1068.)

Pro–Tech submitted evidence of its profits through the testimony of Donald J. Pfingstler. Pfingstler is a Certified Public Accountant and has testified as a damages expert in other patent cases. (Tr. at 1599 – 1600; DTX 1529.)

Pfingstler calculated Pro–Tech's profits to be $564,733. (DTX 1529: Exhibit 4.) Mr. Pfingstler took all the revenues that Pro–Tech earned from fiscal year 1993 forward and subtracted out all the costs that it incurred over that time period. (Tr. at 1622.) He then added a prejudgment interest calculation based on a present value factor. (Tr. at 1623; DTX 1529: Exhibit 4.)

Pfingstler explained that the main reason for the discrepancy between his calculations and Arnold's calculations is that Arnold overestimated Pro–Tech's profits because he did not include many of Pro–Tech's day-to-day operations in assessing Pro–Tech's costs. (Tr. at 1640, 1643.) Pfingstler maintained

---

12. Courts have held that when a defendant's infringement is deliberate and willful, an accounting of profits is proper under a theory of unjust enrichment. *See Babbit Electronics, Inc.*

*v. Dynascan Corp.*, 38 F.3d 1161, 1182 (11th Cir.1994). As previously discussed, there is ample evidence that Pro–Tech's trademark/trade dress infringement was deliberate and willful.

that because all of Pro–Tech's revenues are attributable to its yellow and black products, virtually all the costs should be considered variable costs. (Tr. at 1622.) The Court agrees. All of Pro–Tech's costs are related to the sale of its yellow and black products, and these costs should be taken into account when calculating its profits.

The Court, however, disagrees with one significant aspect of Pfingstler's calculation, which is the factoring in of Pro–Tech's losses in 1993 and 1996. (DTX 1529: Exhibit 4.) Given that the calculation of damages rests on equitable considerations, the Court will not allow Pro–Tech to offset the profits it made in 1995, 1995, 1997, and 1998 by its losses in 1993 and 1996. (Tr. at 1738 – 39.) This determination is consistent with the goal of making violations of the Lanham Act unprofitable to the infringing party. *See Roulo,* 886 F.2d at 941.

Thus, discounting the losses that Pfingstler incorporated into his calculation, the Court finds that Black & Decker is entitled to $840,967 in damages.[13] This figure reflects Pfingstler's calculation of Pro–Tech's profits, (DTX 1529: Exhibit 4), but it sets the profits and interest in 1993 and 1996 at $0, which prevents Pro–Tech from benefitting from its own infringement.

Finally, the Court observes that Pfingstler did not account for projected profits from June 1998 until August 1998. Arnold projected that Pro–Tech would have profited an additional $879,421 during this time period. The Court finds that this projection is reasonable and is consistent with 15 U.S.C. § 1117(a), which permits the district court to allow damages of up to three times the amount of actual damages. In order to deter companies from committing trade dress infringement, the Court concludes that this addition is appropriate and that Black & Decker is entitled to the total sum of $1,720,388.

## II. State Law Claims for Trademark Infringement and Unfair Competition

Black & Decker also contends that the Pro–Tech line uses a color combination that so closely resembles the color scheme on the DeWalt line as to constitute common law trademark infringement and create unfair competition under state law.

 Both of these claims turn on whether there has been a "sale of the goods of one manufacturer or vendor for those of another," *Hanover Star Milling Co. v. Metcalf,* 240 U.S. 403, 412–13, 36 S.Ct. 357, 60 L.Ed. 713 (1916); *see Benj. T. Crump Co. v. J.L. Lindsay, Inc.,* 130 Va. 144, 107 S.E. 679, 682 (Va.1921), and in either case the test is "essentially the same" as the test for trademark infringement and unfair competition pursuant to the Lanham Act, *Lone Star,* 43 F.3d at 930 n. 10. Under this inquiry, the plaintiff first must prove that it has a valid and protectable trademark. *See Lone Star,* 43 F.3d at 930. A color combination and even a color alone can create an enforceable trademark if it "has attained 'secondary meaning' and therefore identifies and distinguishes a particular brand." *Qualitex,* 514 U.S. at 163, 115 S.Ct. 1300. The plaintiff then must demonstrate that the defendant has imitated this trademark in a way that creates a likelihood of confusion. *See Lone Star,* 43 F.3d at 930; *see also RFE Industries, Inc. v. SPM Corp.,* 105 F.3d 923, 926 (4th Cir.) (citing *Rosso & Mastracco, Inc. v. Giant Food Shopping Center of Virginia, Inc.,* 200 Va. 159, 104 S.E.2d 776, 781 (Va. 1958)), *cert. denied,* —— U.S. ——, 117 S.Ct. 2512, 138 L.Ed.2d 1015, 65 U.S.L.W. 3755 (1997).

Applying these principles to this case, Black & Decker's recovery depends on (1) whether the yellow and black color scheme on the DeWalt line achieved secondary meaning so as to create a valid and protectable trademark; and (2) whether the Pro–Tech line imitated this trademark so as to create a likelihood of consumer confusion. As Part I of this Opinion makes clear, Black & Decker established both of these elements when proving its trade dress claim under the Lanham Act, and it is therefore entitled to recover for common law trademark infringement and state law unfair competition as well.

---

**13.** $0 (year 1993 adjusted) + $6,931 (year 1994) + $45,920 (year 1995) + $0 (year 1996 adjusted) + $100,285 (year 1997) + $687,831 (year 1998) = $840,967 total.

*III.* *Trademark Dilution Claim*

Black & Decker next argues that Pro–Tech power tools misappropriate its yellow and black color scheme in a way that constitutes trademark dilution under state and federal law.

■ Neither the Virginia legislature nor the Virginia courts recognize a claim for trademark dilution under state law. *See Circuit City Stores, Inc. v. OfficeMax, Inc.,* 949 F.Supp. 409, 418 (E.D.Va.1996). Consequently, Black & Decker's ability to recover for trademark dilution derives entirely from federal law under the Lanham Act.[14]

■ But federal law did not recognize a claim for trademark dilution at all until Congress amended the Lanham Act by passing the Trademark Dilution Act ("the Dilution Act"). *See id.* at 412. The Dilution Act did not become effective until January 16, 1996, it does not evince a clear congressional intent to operate retroactively, and to apply it to the conduct in this case would expose the Defendants to liability for trademark dilution when no such cause of action existed at the time when they first began to use a yellow and black color scheme. *See id.* at 414–19. Against this background, and in light of the traditional presumption that courts will not give retroactive effect to intervening statutes, Black & Decker's attempt to collect damages for trademark dilution must fail as

a matter of law. *See id.* (concluding that the Dilution Act is not retroactive).

Courts are split on whether the presumption against retroactivity also prohibits injunctive relief in this context. *Compare Circuit City Stores,* 949 F.Supp. at 417–18 (refusing to enjoin conduct that became illegal only after Congress enacted the Dilution Act) *with Viacom, Inc. v. Ingram Enterprises, Inc.,* 141 F.3d 886, 889–90 (8th Cir.1998) (holding that retroactivity concerns do not preclude injunctive relief against continuing acts of trademark dilution). The parties have not fully addressed this issue in their briefs, and the Court need not reach it at all, having concluded in Part I of this opinion that Black & Decker is entitled to an injunction for trade dress infringement under the Lanham Act.

*IV.* *Design Patent Infringement Claim*

■ Black & Decker further alleges that the Pro–Tech CS7212 12″ compound mitre saw infringes on a patent that it owns for the DeWalt DW705. *See* United States Design Patent No. 346,173.

A. Liability

■ A patent infringement analysis involves two steps: (1) the proper construction of the asserted claims without regard for the accused methods or products; and (2) a determination as to whether the accused meth-

**14.** "(1) The owner of a famous mark shall be entitled, subject to the principles of equity and upon such terms as the court deems reasonable, to an injunction against another person's commercial use in commerce of a mark or trade name, if such use begins after the mark has become famous and causes dilution of the distinctive quality of the mark, and to obtain such other relief as is provided in this subsection. In determining whether a mark is distinctive and famous, a court may consider factors such as, but not limited to—

(A) the degree of inherent or acquired distinctiveness of the mark;

(B) the duration and extent of use of the mark in connection with the goods or services with which the mark is used;

(C) the duration and extent of advertising and publicity of the mark;

(D) the geographical extent of the trading area in which the mark is used;

(E) the channels of trade for the goods or services with which the mark is used;

(F) the degree of recognition of the mark in the trading areas and channels of trade used by the marks' owner and the person against whom the injunction is sought;

(G) the nature and extent of use of the same or similar marks by third parties; and

(H) whether the mark was registered under the Act of March 3, 1881, or the Act of February 20, 1905, or on the principal register.

.(2) In an action brought under this subsection, the owner of the famous mark shall be entitled only to injunctive relief unless the person against whom the injunction is sought willfully intended to trade on the owner's reputation or to cause dilution of the famous mark. If such willful intent is proven, the owner of the famous mark shall also be entitled to the remedies set forth in sections 1117(a) and 1118 of this title, subject to the discretion of the court and the principles of equity." 15 U.S.C. § 1125(c).

ods or products infringe on the asserted claims as properly construed. *See Markman v. Westview Instruments, Inc.,* 517 U.S. 370, 384, 116 S.Ct. 1384, 134 L.Ed.2d 577 (1996). This Court previously ruled that the scope of the '173 patent is the "overall visual impression" created by its accompanying six orthogonal design drawings. *See id.; Elmer v. ICC Fabricating, Inc.,* 67 F.3d 1571, 1577 (Fed. Cir.1995).

Consequently, in order to find patent infringement, the Court must determine (1) that the DeWalt DW705 has an overall visual impression that is novel and ornamental in a way that distinguishes it from prior art, *see Oddzon Prods., Inc. v. Just Toys, Inc.,* 122 F.3d 1396, 1405 (Fed.Cir.1997); and (2) that the Pro–Tech CS7212 imitates those ornamental features so as to create a substantially similar overall visual impression that would deceive an ordinary person giving such attention as a purchaser usually gives, *see Elmer,* 67 F.3d at 1577. "If, in the eye of an ordinary observer, giving such attention as a purchaser usually gives, [the] two designs are substantially the same, if the resemblance is such as to deceive such an observer, inducing him to purchase one supposing it to be the other," then the Court must conclude that the Pro–Tech CS7212 infringes on Black & Decker's patent for the DeWalt DW705. *Elmer* 67 F.3d at 1577 (quoting *Gorham Mfg. Co. v. White,* 81 U.S. (14 Wall.) 511, 528, 20 L.Ed. 731 (1871)).

As William S. Taylor—who headed the design team for the DeWalt 12″ compound mitre saw—explained at trial, although many of the parts on the DW705 have a functional purpose, their specific shape is merely decorative. (Tr. at 665 – 68, 680 – 96, 701 – 08.) These parts include the opening on the mitre scale, the end of the kerf plate, the front feet, the rear feet, the front angle adjustment knob, the trunnion spring, the upper blade guard, and the back view of the saw itself. At the time that Black & Decker incorporated the aesthetic characteristics of these parts into the design of the DW705, they collectively differed from anything that existed in prior art (Tr. at 707 – 08; PTX 1128), and therefore created a novel and ornamental overall visual impression that the '173 patent rendered enforceable as of April, 1994 (PTX 306).[15]

When viewed from any of the positions shown in Black & Decker's patent for the 12″ compound mitre saw, and considering only the ornamental aspects of the claimed and accused designs, the Pro–Tech CS7212 conveys an overall visual impression that is substantially similar to that of the DeWalt DW705—and which clearly would confuse an ordinary observer. (PTX 1120.) The CS7212 appropriates a number of specific novel and ornamental features on the DW705 that give rise to this confusingly similar visual impression: (1) the opening on the mitre scale is triangular (Tr. at 680 – 81); (2) the end of the kerf plate is elongated and rounded (Tr. at 682 – 83); (3) the front feet extensions have radial shaping (Tr. at 686 – 87); (4) the feet on the rear of the base are extended and narrow (Tr. at 687 – 88); (5) the front angle adjustment knob has a non-spoked shape (Tr. at 688 – 89); (6) the spring in the trunnion is rectangular rather than circular (Tr. at 689 – 91); and (7) the upper blade guard has a raised ridge (Tr. at 695 – 96). The back view of the lower portion of each saw also resembles the other. (Tr. at 701 – 04.)

Daniel Moon—the Defendants' industrial design expert—attempted to point out piece-by-piece differences between some of the

---

**15.** The Defendants made a number of references to "prior art" in the notice that they provided pursuant to 35 U.S.C. § 282, in their Exhibit List, and in the report of their industrial design expert, Daniel Moon. (Defendants' Request for Admission of Prior Art.) But Moon admitted during his deposition that he could not answer whether this "prior art" rendered the '173 patent valid or invalid (Tr. at 1763), and the Defendants otherwise failed to explain in their pleadings or at trial how any of this "prior art" affected the scope of the '173 patent. Even the Defendants' post-trial submissions did nothing more than to list other patents and to label them as "prior art"—under the assumption that this invocation alone would suffice to defeat the Plaintiffs' patent infringement claim. Having failed to analyze these other patents in any way, the Defendants left the testimony of William Taylor essentially unrebutted—thereby requiring this Court to conclude that when Black & Decker developed the aesthetic features of the DW705, they collectively differed from anything present in prior art. (Tr. at 707 – 08.)

parts on the two mitre saws (Tr. at 1513), and to argue that certain decorative characteristics actually had a functional purpose (Tr. at 1507). But his methodology employed a side-by-side comparison of the functional as well as nonfunctional differences between the two saws, instead of evaluating the overall visual impression created by the ornamental features of each product standing alone. (Tr. at 1556 – 57.)

This methodological error renders Moon's testimony analytically insufficient to rebut the Plaintiffs' proof of design patent infringement. As a legion of case law makes clear, although "differences [between two products] must not be overlooked ... the controlling consideration in determining whether two designs are substantially the same is the resultant effect of the whole." *Nebel Knitting Co. v. Sanson Hosiery Mills,* 214 F.2d 781, 784 (4th Cir.1954) (citing *Gorham Co.,* 81 U.S. (14 Wall.) at 528). Expressed differently, "[t]he patented and accused designs do not have to be identical in order for design patent infringement to be found. It is the appearance of a design as a whole which is controlling in determining infringement." *Oddzon Prods.,* 122 F.3d at 1405 (citing *Braun Inc. v. Dynamics Corp.,* 975 F.2d 815, 820 (Fed.Cir. 1992)).

Moreover, even if Moon's testimony were otherwise relevant, the Court would still discount his testimony in light of his limited background as an industrial designer who specializes in fitness products (Tr. at 1463) and who has never designed power tools (Tr. at 1525). Giving appropriate weight to the testimony of William S. Taylor—whose experience as a power tool designer provided him with an ample basis to evaluate the two products at issue (Tr. at 665 – 68)—the Court concludes that the DeWalt DW705 has novel and ornamental features that distinguish it from prior art, and that the Pro–Tech CS7212 mimics those features so as to create a substantially similar overall visual impression that would deceive an ordinary observer giving such attention as a purchaser usually gives. The Court therefore finds that Pro–Tech has infringed on United States Design Patent No. 346,173.

**B. Damages**

35 U.S.C. § 284 provides that "[u]pon finding for the claimant the court shall award the claimant damages adequate to compensate for the infringement, but in no event less than a reasonable royalty for the use made of the invention by the infringer, together with interest and costs as fixed by the court."

"The measure of damages is an amount which will compensate the patent owner for the pecuniary loss sustained because of the infringement." *State Industries, Inc. v. Mor–Flo Industries, Inc.,* 883 F.2d 1573, 1577 (Fed.Cir.1989). In order for the patent owner to obtain lost profits as actual damages, there must be a demonstration that there was a reasonable probability that, but for the infringement, it would have made the infringer's sales. *See id.*

One way for a patentee to prove its entitlement to lost profits is to show: "(1) demand for the patented product, (2)[the] absence of noninfringing substitutes, (3) his manufacturing and marketing capability to exploit the demand, and (4) the amount of the profit he would have made." *Rite–Hite Corp. v. Kelley Co.,* 56 F.3d 1538, 1545 (Fed. Cir.1995) (en banc) (citing banc) (citing *Panduit Corp. v. Stahlin Bros. Fibre Works,* 575 F.2d 1152, 1156 (6th Cir.1978)); *State Industries,* 883 F.2d at 1577. Evidence of these four elements permits a court to infer that the plaintiff's lost profits were caused by the defendant's infringing sales. *See Rite–Hite,* 56 F.3d at 1545.

Pro–Tech sufficiently established that there are noninfringing substitutes for Black & Decker's DW705 12″ compound miter saw. (Tr. at 1130 – 32.) Black & Decker's own expert, Jonathan I. Arnold, stated that there were other 12″ compound miter saws available in 1997, which is the relevant time period. (Tr. at 1130.) Moreover, Pro–Tech's damages expert, Donald J. Pfingstler, also testified that there were noninfringing substitutes for Black & Decker's miter saw. (Tr. at 1666 – 67, 1669.) Four companies were named as having 12″ compound miter saws that could be substitutes for the DW705, including Makita, Skil, Ryobi, and

Delta. Against this background, the Court finds that applying a lost profits analysis to assess Black & Decker's damages for the patent infringement is inappropriate.

■ Alternatively, Pfingstler explained that he calculated patent infringement damages based on Pro–Tech's unjust enrichment rather than on Black & Decker's lost profits, in the total amount of $870,061. (Tr. at 1729 – 32; DTX 1529: Exhibits 7.) But how Pfingstler made this calculation is unclear from his testimony and his reports. He testified that the unjust enrichment was $870,061, but his submitted report shows that the calculated unjust enrichment totaled $765,278. (DTX 1529: Exhibit 7.) Pfingstler provided no reasons for the discrepancy and no explanation of his underlying methodology, and the Court cannot blindly use his measure of patent infringement damages.

As a result, the Court must assess damages based on what a hypothetical royalty agreement would provide. Under 35 U.S.C. § 284:

> [a] patentee is entitled to no less than a reasonable royalty rate on an infringer's sales for which the patentee has not established entitlement to lost profits. The royalty may be based upon an established royalty, if there is one, or if not, upon the supposed result of hypothetical negotiations between the plaintiff and the defendant. The hypothetical negotiation requires the court to envision the terms of a licensing agreement reached as the result of a supposed meeting between the patentee and the infringer at the time infringement began.

*Id.* at 1554.

Because neither Black & Decker nor Pro–Tech has submitted any evidence as to what an appropriate royalty agreement might have been, the Court will allow each party to submit further briefs, evidence, and/or arguments on this issue. The Court reserves judgment on the appropriate award of design patent infringement damages until after it hears from the parties.

## V. Copyright Infringement Claim

■ Black & Decker claims that Pro–Tech infringed on the copyright on its DW705 12″ compound miter saw Instruction Manual in violation of 17 U.S.C. §§ 101 and 106. Specifically, Black & Decker contends that Pro–Tech copied two drawings from the DW705 manual and published similar-looking drawings in Pro–Tech's CS7212 Instruction Manual. (Tr. at 1588 – 89; PTX 15 at 14; PTX 16 at 18; PTX 287.)

■ To prove copyright infringement, a plaintiff must show (1) that it owns a valid copyright; and (2) that the defendant copied constituent elements of the copyrighted work that are original. *See Feist Publications, Inc. v. Rural Telephone Service Co.,* 499 U.S. 340, 361, 111 S.Ct. 1282, 113 L.Ed.2d 358 (1991); *Towler v. Sayles,* 76 F.3d 579, 581 (4th Cir.1996). It is undisputed that Black & Decker possesses a valid copyright to the DeWalt Instruction Manual for its DW705 12″ compound miter saw. (PTX 284.) Therefore, the question is whether Pro–Tech copied something original to Black Decker. *See Feist,* 499 U.S. at 361, 111 S.Ct. 1282. The Court must first ask whether the diagrams at issue were copied, and second, whether the diagrams are sufficiently original to possess copyright protection. A plaintiff can raise a presumption of copying if it shows that the defendant had access to its copyrighted work and if it can show that the copyrighted work and the copied work look substantially similar. *See Towler,* 76 F.3d at 582.

In a memo dated January 9, 1996, Eric Fernandes wrote to P & F, "I am faxing my correction for the CS7212 Instruction Manual.... My corrections for page 18 of the CS7212 include two pictures that I took from the DeWalt DW705 Instruction Manual. Please let me know if P & F can create pictures like this to show how to place crown molding on the miter saw." (PTX 16A.) This memo demonstrates that Pro–Tech had access to Black & Decker's diagrams.

Moreover, there is no question that Pro–Tech's pictures in its manual are substantially similar to Black & Decker's pictures. (PTX 287.) The diagrams in both instruction manuals illustrate how to cut crown molding;

the dimensions of the diagrams are approximately the same; the words used to label the diagrams are almost verbatim; and the actual drawings are virtually identical. The only difference is that Black & Decker's drawings are shaded. Observing the diagrams makes clear that any reasonable person would find them substantially similar. *See Data East USA, Inc. v. Epyx, Inc.,* 862 F.2d 204, 208 (9th Cir.1988). Accordingly, Black & Decker has shown that its diagrams were copied.

 The last issue to consider is whether Black & Decker's drawings are copyright protected. A "fundamental axiom of copyright law is that no author may copyright his ideas or the facts he narrates." *Feist,* 499 U.S. at 344–45, 111 S.Ct. 1282. The Supreme Court in *Feist* explained that "[t]he mere fact that a work is copyrighted does not mean that every element of the work may be protected." *Id.* at 348, 111 S.Ct. 1282. "The sine qua non of copyright is originality." *Id.* at 345, 111 S.Ct. 1282. Accordingly, copyright protection may extend only to those components of a work that are original to the author. *See id.* at 348, 111 S.Ct. 1282. Thus, the relevant question is whether Black & Decker's diagrams are sufficiently original to possess copyright protection.

In *Decorative Aides Corp. v. Staple Sewing Aides Corp.,* the plaintiff owned a registered copyright for its instructions on how to apply a drapery header. 497 F.Supp. 154, 156 (S.D.N.Y.1980). The defendant printed on its drapery product an illustrative diagram and some instructional language, both of which were similar to portions of the plaintiff's copyrighted instructions. The plaintiff sued for copyright infringement. *See id.* at 157.

The district court found that although the defendant's diagram and instructional language were similar to the plaintiff's copyrighted work, the similarities could not be the basis of an infringement charge, for they were dictated by functional considerations. The court recognized that instructions for applying a drapery header could be expressed only in limited ways, such that the defendant's printing of the diagrams and instructional language did not constitute copy-

right infringement. *See id.* (citing *Reyher v. Children's Television Workshop,* 533 F.2d 87, 91 (2d Cir.1976) (providing that "[s]imilarity of expression ... which necessarily results from the fact that the common idea is only capable of expression in more or less stereotyped form will preclude a finding of actionable similarity") (citation omitted)).

Eric Fernandes indicated during his deposition that as a practical matter, there were only limited ways to convey the message illustrated in the instructional diagrams at issue. (Tr. at 810.) Black & Decker presented no evidence or arguments to rebut Fernandes's contention. The absence of such evidence supports the conclusion that there are only limited methods of illustrating how to cut crown molding.

Against this background, the Court finds that Black & Decker's drawings do not satisfy the minimal requirement of originality and that the drawings are dictated by functional considerations. Because Black & Decker's drawings in its instructional manual are not entitled to copyright protection, its copyright infringement claim must be denied.

### VI. False Advertising Claims and Counterclaim

Black & Decker claims that Pro–Tech engaged in false advertising, under § 43(a) of the Lanham Act, 15 U.S.C. § 1125(a), by falsely representing that its 12″ compound miter saws had 100% ball-bearing construction and that the saws had motor speeds capable of achieving 4,000 RPM. Pro–Tech counterclaims that Black & Decker engaged in false advertising by misrepresenting that all of its DeWalt products were "Made in the USA."

 In order to establish a claim of false advertising under the Lanham Act, a claimant must prove by a preponderance of the evidence that:

(1) a false statement of fact [was made] by the defendant in a commercial advertisement about its own or another's product; (2) the statement actually deceived or has the tendency to deceive a substantial segment of its audience; (3) the deception is material, in that it is likely to influence the

purchasing decision; (4) the defendant caused its false statement to enter interstate commerce; and (5) the plaintiff has been or is likely to be injured as a result of the false statement, either by direct diversion of sales from itself to defendant or by a loss of goodwill associated with its products.

*United Industries Corp. v. Clorox Co.,* 140 F.3d 1175, 1180 (8th Cir.1998); *Southland Sod Farms v. Stover Seed Co.,* 108 F.3d 1134, 1139 (9th Cir.1997); *Johnson & Johnson–Merck Consumer Pharmaceuticals Co. v. Rhone–Poulenc Rorer Pharmaceuticals, Inc.,* 19 F.3d 125, 129 (3d Cir.1994).

There are two categories in which a Lanham Act false statement may fall. First, there are commercial claims that are literally false as a factual matter, either on their face or by necessary implication, and second, there are claims that may be literally true or ambiguous but which implicitly convey a false impression, are misleading in context, or are likely to deceive consumers. *See Clorox,* 140 F.3d at 1180; *C.B. Fleet Co. v. SmithKline Beecham Consumer Healthcare,* 131 F.3d 430, 45 U.S.P.Q.2d 1119, 1122 (4th Cir.1997); *Southland Sod Farms,* 108 F.3d at 1139; *Mylan Laboratories, Inc. v. Matkari,* 7 F.3d 1130, 1138 (4th Cir.1993).

Each false advertising claim and counterclaim alleges literally false advertisements. Black & Decker argues that Pro–Tech's 100% ball-bearing construction and 4,000 RPM advertisements were literally false. Pro–Tech alleges that Black & Decker's "Made in the USA" advertisements convey the message that all of the DeWalt products were made in the United States, which is literally false. Given the arguments, these claims do not fall into the second category of false advertising under the Lanham Act, and the proper analysis is whether these advertisements were in fact literally false.

In addition to proving that an advertisement is literally false, a plaintiff who seeks to obtain an injunction "must also show that it will suffer irreparable harm if the injunction is not granted." *Seven–Up Co. v. Coca–Cola Co.,* 86 F.3d 1379, 1390 (5th Cir. 1996); *McNeil–P.C.C., Inc. v. Bristol–Myers Squibb Co.,* 938 F.2d 1544, 1549 (2d Cir.1991).

As the Second Circuit explained in *Coca–Cola Co. v. Tropicana Products, Inc.:*

> [T]he most difficult element to demonstrate when seeking an injunction against false advertising is the likelihood that one will suffer irreparable harm if the injunction does not issue. It is virtually impossible to prove that so much of one's sales will be lost or that one's goodwill will be damaged as a direct result of a competitor's advertisement. Too many market variables enter into the advertising-sales equation. Because of these impediments, a Lanham Act plaintiff who can prove actual lost sales may obtain an injunction even if most of his sales decline is attributable to factors other than the competitor's false advertising. In fact, he need not even point to an actual loss or diversion of sales.
>
> The Lanham Act plaintiff must, however, offer something more than a mere subjective belief that he is likely to be injured as a result of the false advertising, he must submit proof which provides a reasonable basis for that belief. The likelihood of injury and causation will not be presumed, but must be demonstrated in some manner.

690 F.2d 312, 316 (2d Cir.1982) (internal citations omitted); *see also Johnson & Johnson v. Carter–Wallace, Inc.,* 631 F.2d 186, 189–90 (2d Cir.1980).

Courts have explained that a demonstration that the competitor's advertising tends to mislead consumers satisfies the Lanham Act's irreparable harm requirement. *See Coca Cola,* 690 F.2d at 316–17; *Clorox,* 140 F.3d at 1183. In *Coca Cola,* for example, a survey and a consumer test provided evidence of consumer confusion. 690 F.2d at 317. The court found that these studies demonstrated that the commercial at issue was likely to mislead consumers, and that as a consequence, consumers would shift their purchases from the plaintiff's product to the defendant's. The studies supplied the causal link between the advertising and the plaintiff's potential lost sales, thereby indicating a likelihood of injury.

Similarly, in *Johnson & Johnson*, the Second Circuit found that the plaintiff had sufficiently demonstrated that it was likely to be damaged by the defendant's false advertising. 631 F.2d at 190–91. There the court noted that the defendant's share of the market had increased since it began its advertising scheme and the plaintiff's share had declined. In addition, a witness testified that she had switched from using the plaintiff's product to the defendant's based on her misinterpretation of the advertisement. Moreover, the plaintiff introduced surveys indicating that some people, after viewing the advertisements at issue, were misled into believing the "false" aspect of the advertisement. *See id.*

■ 15 U.S.C. § 1117(a) provides that a plaintiff who prevails on a false advertising claim is also entitled to "any damages sustained." To recover damages for false advertising, a plaintiff "must prove both actual damages and a causal link between [the defendant's] violation and those damages." *Clorox*, 140 F.3d at 1180; *Rhone–Poulenc Rorer Pharmaceuticals, Inc. v. Marion Merrell Dow, Inc.*, 93 F.3d 511 (8th Cir.1996). An award of damages requires a greater showing of proof than a claim for injunctive relief. *See Johnson & Johnson*, 631 F.2d at 190. The plaintiff must show a definite amount of sales lost in order to recover damages. *See id.* at 191.

### A. 100% Ball–Bearing Construction

Black & Decker contends that Pro–Tech falsely advertised that its 12″ compound miter saw had 100% ball-bearing construction. It is undisputed both that Pro–Tech advertised that its product had 100% ball-bearing construction and that the representation was literally false. (Tr. at 317–18; PTX 12.)

■ Black & Decker, despite proving that the 100% ball-bearing advertisement was literally false, has not proven sufficient injury for this Court to grant an injunction. Pro–Tech has stopped advertising 100% ball-bearing construction on its 12″ compound miter saw. (Tr. at 313, 319; DTX 61 at P027716.) Nothing in the record suggests that Pro–Tech will again begin advertising that this miter saw has 100% ball-bearing construction, and the Court finds that Black & Decker will not suffer irreparable harm absent a permanent injunction against Pro–Tech's advertisements of "100% ball-bearing construction" on its 12″ compound miter saws. *See Seven–Up Co. v. Coca–Cola Co.*, 86 F.3d at 1390 (finding that there was no evidence of irreparable harm when the defendant had changed its advertisement such that it was no longer literally false). Therefore, Black & Decker's claim for a permanent injunction is denied.

### B. 4,000 RPM Motor Speed

Black & Decker further contends that Pro–Tech's advertisement of a 4,000 RPM motor speed on its 12″ compound miter saw constituted false advertising. This claim also fails.

Pro–Tech previously advertised that its 12″ compound miter saw had a motor speed of 4,000 RPM. Although a K–Mart test found the actual motor speed to be 3,650 RPM, this was found to be an acceptable variance speed. (Tr. at 320 – 23; 1370.) Black & Decker presented no evidence to rebut the K–Mart test or otherwise show that Pro–Tech's advertisements were literally false. But the Court need not rule on whether Pro–Tech's advertisements were in fact false, other than to note that it is doubtful that Black & Decker established literal falsity.

■ In any event, Black & Decker has not proven a likelihood that it will suffer irreparable harm absent an injunction. Pro–Tech no longer advertises that its 12″ compound miter saw has a motor speed of 4,000 RPM. It now advertises that the saw runs at a speed of 3,800 RPM, which is an accurate listing. (Tr. at 1373 – 75; DTX 61.) There was no suggestion at trial that this current representation of 3,800 RPM is false or misleading. In light of the change, the Court cannot find that Black & Decker has established that it is likely to suffer irreparable injury. *See Seven–Up Co.*, 86 F.3d at 1390. Therefore, Black & Decker's request for a permanent injunction must be denied.

■ Similarly, no evidence has been presented of actual harm resulting from Pro–

Tech's advertisements of 100% ball-bearing construction and a 4,000 RPM motor speed. Black & Decker's expert, Jonathan I. Arnold, estimated the damages from Pro–Tech's alleged false advertising to be $659,296. (PTX 375: Table 1.) This amount was based on Pro–Tech's profits from having sold the CS7212 12″ compound miter saw.

But no evidence was presented as to the causal connection between these alleged false advertisements and the resulting benefits to Pro–Tech. *See Clorox,* 140 F.3d at 1180 (requiring both actual damages and a causal link to be proven). Even though Pro–Tech may have accumulated profits from sales of its 12″ compound miter saw, there is no evidence that those profits were the result of its false advertisements. *See Harper House, Inc v. Thomas Nelson, Inc.,* 889 F.2d 197, 209 n. 8 (9th Cir.1989) (explaining that "even if consumers are likely to suffer injury from a defendant's deception about its own product, when advertising does not directly compare defendant's and plaintiff's products . . . injury to a particular competitor may be a small fraction of the defendant's sales, profits, or advertising expenses").

Without a sufficient showing of irreparable harm, and without any causal connection between the false advertisements at issue and any alleged damages, the Court must deny Black & Decker's false advertising claims.

### C. "Made in the USA" Designation

 Pro–Tech counterclaims that Black & Decker's advertisements, some of which include a "Made in the USA" logo, constitute false advertising. The Court must first make a factual determination as to whether Black & Decker's advertisements are literally false. *See C.B. Fleet,* 131 F.3d 430, 45 U.S.P.Q.2d at 1122. In assessing whether an advertisement is literally false, on its face or by necessary implication, the Court must analyze the message conveyed within its full context. *See Clorox,* 140 F.3d at 1180; *Southland Sod Farms,* 108 F.3d at 1139.

As evidence of literally false statements, Pro–Tech highlights the following: (1) Black & Decker's vehicles which have "DeWalt Industrial Tools" designations and "Made in the USA" logos (DTX 91, a DeWalt van; PTX 705, a DeWalt truck; DTX 121, a NASCAR race car); (2) Black & Decker's 1995–1998 catalogs which include "Made in the USA" logos on the warranty page without indicating which tools were or were not made in the United States (Tr. at 290 – 92); (3) Black & Decker's placement of the "Made in the USA" logos on various advertising and promotional literature (DTX 1121); and (4) Black & Decker's marketing efforts (Tr. at 245 – 47; DTX 16; DTX 25). This evidence, however, does not prove that Black & Decker's advertisements are literally false.

#### 1. Black & Decker Vehicles

This Court does not find that the Black & Decker vehicles, including the vans, trucks, and the NASCAR race car, portray the message that all DeWalt products are made in the United States. The vehicles display both the DeWalt name and the "Made in the USA" logo. The "Made in the USA" logo, however, is significantly smaller and less noticeable than the DeWalt name. (DTX 91; PTX 705; DTX 121.) Nowhere do the vehicles state that every single DeWalt product is made in the United States, and the Court does not find that such a message is conveyed.

Instead, these vehicles suggest that most DeWalt products are made in the United States. This message is not false. Joseph Galli, who is now the President of Black & Decker's Worldwide Power Tools and Accessories Division, testified that eighty-seven percent of the DeWalt products are made in the United States. (Tr. at 211.) Moreover, each individual DeWalt product and each product's packaging properly indicates where that product was made. (Tr. 283, 292.)

#### 2. Warranty Page

The Court does not find that Black & Decker's placement of the "Made in the USA" logo on the warranty page of its catalogues, without identifying which products are made in the United States, conveys the message that all DeWalt products are made in the United States. (Tr. at 240, 291 – 92.) This logo appears on only one page out of an entire catalogue, amounting to such limited exposure that this Court cannot conclude

that it conveys the message that all DeWalt products are made in the United States.

3. Various Other Promotional Literature

Pro–Tech identifies DTX 58 as an example of Black Decker's use of the "Made in the USA" logo in a catalogue, and argues that this exhibit constitutes evidence of false advertising. (Tr. at 290 – 92; DTX 58: PT38142.) That catalogue, however, is over one hundred pages long, and the "Made in the USA" is on only one page in the upper left hand corner. This advertisement does not suggest that all DeWalt products are made in the United States.

As another example of Black & Decker's alleged false advertising, Pro–Tech also points to a DeWalt advertisement that promoted a sale of DeWalt tools on a specific date and place. (Tr. at 249 – 52; DTX 1128 at PT51567.) In that advertisement, eight DeWalt items are illustrated, and on the left hand side of the advertisement is a small circle, the bottom of which states "Made in the U.S.A." Because one of the eight highlighted items, the heavy duty angle grinder, was made in Italy,[16] Pro–Tech claims that false advertising occurred.

Looking at the advertisement as a whole, the Court does not find that the small "Made in the U.S.A." logo, on the opposite side of the advertisement from the angle grinder, suggests that every DeWalt tool in that advertisement was made in the United States. Instead, this advertisement conveys the message that most DeWalt products are made in the United States. The advertisement is not literally false.

4. Marketing Material

Pro–Tech further points to Black & Decker's 1995 Sales and Marketing Guide, which according to Pro–Tech, dramatically emphasizes the "Made in the USA" promotional program. (DTX 25.) In this Marketing Guide, there is a reference to DeWalt tools being American, and the "Made in the USA" logo is displayed on some pages. Again, looking at the Sales and Marketing Guide as a whole, this Court does not find that it

suggests that all DeWalt tools are made in the United States.

Pro–Tech also points to a letter sent by Nancy Chaney, Black & Decker's Marketing Communications Manager, to "Field Sales & Marketing." (DTX 116.) In that letter, Nancy Chaney wrote:

You've probably noticed that contractors like the fact that our tools are made in the U.S.A. Naturally, this is important to them. In keeping with that, we've made sure that the majority of our premium items are made right here at home, too.

This marketing letter makes clear that Black & Decker did not try to suggest that all DeWalt tools were made in the United States. Instead, the letter conveys a different message—that the majority of DeWalt products are made in the United States, which is an accurate statement.

In any event, Pro–Tech has failed to show that Black & Decker's "Made in the USA" advertisements are likely to cause it to suffer irreparable harm. *See Seven–Up Co.*, 86 F.3d at 1390. In *Johnson & Johnson*, 631 F.2d at 190–91, and *Coca–Cola Co.*, 690 F.2d at 316–17, the Second Circuit found there to be a reasonable basis for finding irreparable harm in light of consumer and marketing surveys demonstrating that consumers were misled by the advertisements at issue.

Here, Black & Decker and Pro–Tech presented no surveys demonstrating that consumers were misled by Black & Decker's "Made in the USA" advertisements. In fact, Pro–Tech's General Manager, James Lancaster, admitted at trial that he had no evidence that Pro–Tech lost any sales because of Black & Decker's use of the words "Made in the USA" on its vehicles or in its catalogues. (Tr. at 648.) Moreover, Pro–Tech's damages expert, Donald Pfingstler, agreed at trial that he could not testify that there was any injury as a result of Black & Decker's use of the "Made in the USA" logo. (Tr. at 1706.) Finally, even Pro–Tech's Controller, Nora Wang, testified that she did not know of any sales that were canceled as a result of Black

---

**16.** It seems that this item, the seven-inch heavy duty angle grinder, sometimes may have been made in the United States. (Tr. at 259 – 52.)

& Decker's alleged false advertising. (Tr. at 862.)

Pro–Tech presented a letter written to Black & Decker as its only evidence of customer confusion. (DTX 1286.) In that letter, the author wrote to a DeWalt Customer Service Managing Representative, "I was impressed with DeWalt products since they are designed and manufactured to an unmatched quality standard and are produced in the United States." (DTX 1286.)

This letter indicates that one customer believed that DeWalt products were made in the United States, and it suggests that the customer may have been misled by DeWalt's advertisements. But the letter does not state that the customer believed that all DeWalt products were made in the United States or that he switched from using Pro–Tech products to DeWalt products because the latter were made in the United States. Moreover, Pro–Tech's former Marketing Manager, Eric Fernandes, admitted during his deposition that he could not name a single person who was misled by the "Made in the USA" advertisements. (Tr. at 823 – 34.) Evidence that one customer may have been misled is not sufficient to show that Pro–Tech is likely to suffer irreparable harm because of Black & Decker's alleged false advertising.

As further evidence of false advertising, Pro–Tech also argues that Joseph "Galli testified that the millions and billions of impressions that were in the public included impressions that DeWalt products were 'Made in the USA.'" (Defendant's Findings of Fact and Conclusions of Law at 14.) But Galli did not testify in this way. Galli only testified that millions and billions of DeWalt impressions had occurred, meaning that many end users had seen the DeWalt name, but without necessarily seeing the name in conjunction with a "Made in the USA" logo. (Tr. at 185 – 92.) Moreover, this statement does not prove that anyone, let alone millions or billions of people, were deceived into thinking that all DeWalt products were made in the United States. Pro–Tech failed to show a causal connection between the alleged false

advertising and its own sales position, such that its counterclaim for an injunction must fail.

■ Finally, Pro–Tech failed to show that it suffered actual damages because of Black & Decker's false advertising. Pro–Tech's General Manager, James Lancaster, and its damages expert, Donald Pfingstler, admitted that there was no evidence that Pro–Tech lost any sales or suffered any harm because Black & Decker used the words "Made in the USA" on its vehicles or in its catalogues. (Tr. at 648, 1706.) Without such evidence, Pro–Tech's counterclaim for damages must be denied.

## VII. Counterclaim for Unfair Competition

■ Pro–Tech's one remaining counterclaim against Black & Decker is for unfair competition under Section 43(a) of the Lanham Act, 15 U.S.C. § 1125(a).[17] Pro–Tech alleges (1) that Black & Decker knowingly told retailers and others that Pro–Tech's miter saws infringed on protected trademark rights; and (2) that Black & Decker acted with the intent to deceive, to promote Black & Decker's products, and to divert sales away from Pro–Tech. Pro–Tech also alleges that Black & Decker's false representations have caused it to suffer serious harm.

In support of its counterclaim, Pro–Tech submitted in evidence a letter that Galli sent to "valued customers." (DTX 360.) The letter stated that Black & Decker had filed a lawsuit against Pro–Tech because of confusion between Pro–Tech's CS7212 12″ compound miter saw and DeWalt's DW705. The letter also explained that the suit had charged Pro–Tech with patent infringement and violations of the Lanham Act. (DTX 360.)

In *The Wicker Group v. The Standard Register Co.*, this Court recognized that when a defendant sends letters to customers, making false representations of patent infringement and bad faith threats of legal action, the defendant will be held to have violated the Lanham Act. 33 U.S.P.Q.2d 1678, 1679–80 (E.D.Va.1994). "These types of represen-

---

17. In a Memorandum Opinion on December 23, 1997, the Court determined that Pro–Tech could not maintain a common law claim for unfair competition under Virginia law.

tations are likely to have a direct major impact in diverting sales from the plaintiff to the defendant.... The threat to plaintiff's sales posed by Defendants' claims of patent exclusivity raises a viable Lanham Act claim." *Id.* (quoting *Brandt Consol., Inc. v. Agrimar Corp.*, 801 F.Supp. 164, 173–74 (C.D.Ill.1992)).

*Wicker* and *Brandt* enabled Pro–Tech's unfair competition counterclaim to survive Black & Decker's Motion to Dismiss and Motion for Summary Judgment. But Pro–Tech subsequently presented little or no evidence to convince this Court that Black & Decker actually engaged in unfair competition in violation of the Lanham Act.

The Court concludes that the letter that Galli wrote was not a misrepresentation within the meaning of section 43(a) of the Lanham Act. The letter simply explained that Black & Decker had filed suit against Pro–Tech for trademark infringement and patent infringement—and as this Opinion sets forth, both of these claims are meritorious. Consequently, the Court cannot find that this letter contained false representations or that it was a bad faith threat of legal action, especially when the legal action at issue had already commenced by the time the letter was written. The Court further observes that Pro–Tech did not question Galli at trial about his August 25, 1997 letter informing customers about Pro–Tech's alleged trademark infringement, and similarly did not inquire about the truthfulness of this letter. In fact, Pro–Tech's final forty-eight page brief barely mentioned its unfair competition counterclaim, seemingly evidencing the weakness of this cause of action.

With little more than Joseph Galli's August 25, 1997 letter as evidence that Black & Decker engaged in unfair competition in violation of 15 U.S.C. § 1125(a), this Court finds that Pro–Tech has not adequately proven its case. The Court will find for Black & Decker on Pro–Tech's counterclaim for unfair competition under the Lanham Act.

## CONCLUSION

For the foregoing reasons, the Court finds:

(1) that the claims against P & F Brother Industrial Corporation and Nu–Way Machinery Corporation must be dismissed for lack of personal jurisdiction;

(2) with respect to Counts 1, 2, and 3 of the Amended Complaints in these consolidated cases:

(a) that the yellow and black color scheme on the DeWalt line of professional power tools constitutes a primarily nonfunctional trade dress;

(b) that this trade dress has possessed secondary meaning since May 1, 1992;

(c) that the Pro–Tech line of professional power tools mimics this trade dress in a way that creates a likelihood of confusion; and

(d) that Black & Decker is entitled to an injunction against Pro–Tech Power Incorporated, and to trade dress infringement damages in the amount of $1,720,388.00;

(3) with respect to Count 5 of the Amended Complaint in Civil Action No. 97–1123–A:

(a) that the scope of United States Design Patent No. 346,173 is the "overall visual impression" conveyed by Black & Decker's DeWalt DW705 12″ Compound Mitre Saw;

(b) that this overall visual impression is novel and ornamental in a way that distinguishes it from prior art;

(c) that the Pro–Tech CS7212 12″ Compound Mitre Saw imitates those novel and ornamental features so as to create a substantially similar overall visual impression that would deceive an ordinary person giving such attention as a purchaser usually gives; and

(d) that Black & Decker is entitled to an injunction against Pro–Tech Power Incorporated, and to patent infringement damages in an amount that the Court will determine after the parties submit further briefs, evidence, and/or arguments.

AN APPROPRIATE ORDER SHALL ISSUE.

## ORDER

For the reasons set forth in the attached Memorandum Opinion, it is hereby ORDERED:

(1) that all claims against P & F Brother Industrial Corporation and Nu–Way Machinery Corporation are dismissed for lack of personal jurisdiction;

(2) that judgment shall issue against Pro–Tech Power Incorporated on Counts 1, 2, and 3 of the Amended Complaints in these consolidated cases, and on Count 5 of the Amended Complaint in Civil Action No. 97–1123–A;

(3) that judgment shall issue for Pro–Tech Power Incorporated on Count 4 of the Amended Complaints in these consolidated cases, and on Counts 6 and 7 of the Amended Complaint in Civil Action No. 97–1123–A;

(4) that judgment shall issue for Black & Decker (U.S.) Inc., The Black & Decker Corporation, and Black & Decker Inc. on all counterclaims;

(5) that Pro–Tech Power Incorporated shall pay money damages on Counts 1, 2, and 3 in the amount of $1,720,388.00;

(6) that Pro–Tech Power Incorporated shall pay money damages on Count 5 in an amount that the Court will determine upon the presentation of further briefs, evidence, and/or arguments by the parties;

(7) that Pro–Tech Power Incorporated, its agents, servants, and employees are enjoined:

(a) from selling, marketing, or distributing any power tools in the United States, to the extent that those power tools use a yellow and black color combination; and

(b) from selling, marketing, or distributing a 12″ Compound Mitre Saw, to the extent that it mimics the novel and ornamental features of the DeWalt DW705 so as to convey a substantially similar overall visual impression;

(8) that the parties shall contact the Court by telephone within ten days in order to establish a schedule by which briefs, evidence, and/or arguments can be offered with respect to the patent infringement damages that Pro–Tech Power Incorporated should pay, and with respect to any attorneys' fees that the Court should assess against one or more of the parties; and

(9) that the Clerk of the Court shall forward copies of this Memorandum Opinion and Order to all counsel of record.